[Civ. No. 6105. Fifth Dist. Feb. 11, 1983.]

LEON Y. GEORGE et al., Plaintiffs and Appellants, v.
GEORGE GOSHGARIAN et al., Defendants and Respondents.

COUNSEL

Leon Y. George, in pro. per., Henry & Avila, J. V. Henry and Jesse J. Avila for Plaintiffs and Appellants.

Vartabedian & Poochigian and Steven M. Vartabedian for Defendants and Respondents.

OPINION

**FRANSON, Acting P. J.**—This is an appeal from an order granting a motion for summary judgment in favor of respondents. The trial court ruled as a matter of law that appellants as the owners of lot 62 of the Sierra Sky Park, Inc., subdivision did not have an easement for transmission of electrical power across lot 115 owned by respondents. As we shall explain, triable issues of fact must be resolved before it can be determined whether appellants had such an easement. Accordingly, we reverse the summary judgment.

On May 5, 1977, appellants purchased lot 62 for the purpose of building a home. Lot 62, together with lots 52 through 65, is situated on a bluff overlooking

the San Joaquin River. Respondents' lot 115 is generally located on the side of the bluff along the northern boundary of lots 52 through 65. A large manmade ditch near the bottom of the bluff runs parallel to the bluff lots. The center of the ditch is about 50 feet from the bluff lots. Lot 115 is zoned as open land.

In 1946 Sierra Sky Park, Inc., the original developer and owner of all the subdivision lots including lot 115, recorded restrictions affecting the subdivision. Paragraph 21 of the restrictions provides: "Rights of way eight feet in width *off of the rear* of each of said lots are reserved for the purpose of erecting and maintaining combination power and telephone lines and other public utilities." (Italics added.) The parties agree that this restriction created an eight-foot wide utility easement on the southern boundary of lot 115 for the benefit of the bluff lots.[1] This easement was never utilized except for the placement of utility poles for the purpose of receiving distribution lines from the main Pacific Gas & Electric Company (P.G.& E.) powerline hereinafter described on lot 115.

In 1960 Sierra Sky Park, Inc., granted to P.G.& E. a right-of-way for electrical powerlines across lot 115. This unrecorded conveyance provides that Sierra Sky Park, Inc., "does hereby grant to [P.G.& E.] . . . the right to erect, maintain, replace, remove and use a line of poles with all necessary and proper crossarms, braces, anchors, guides and other appliances and fixtures for the use in connection therewith, and to suspend therefrom, maintain and use such wires as [P.G. & E.] shall from time to time deem necessary for the transmission *and distribution* of electrical energy together with a right-of-way along said line of poles, over and across those certain premises described as . . . lot 115." (Italics added.)

Rather than placing the 1960 right-of-way along the eight-foot utility easement dedicated "off of" the rear of the bluff lots as provided by the 1946 subdivision map restrictions, the developer and P.G.& E. agreed to locate the powerline on lot 115 along the ditch at the bottom of the bluff, approximately fifty feet from the northern edge of the bluff lots. This change was made at the developer's request to prevent the powerlines from intruding into the view of the bluff lots and "since . . . the distance from the [proposed] line to any of the [bluff] lots was fairly short, . . ." (P.U.C. letter dated Feb. 17, 1978.) The powerline was thereafter placed along the ditch as per the easement grant to P.G.& E.[2]

---

[1] The parties and the Public Utilities Commission assume that the easement is on lot 115. However, when the restriction is read in context with the subdivision map where many of the nonbluff lots abut each other at the rear, it is clear that the easement is on the northern eight feet of the bluff lots themselves.

[2] There is some indication in the record that the powerline along the ditch was built in 1957 which would mean that the 1960 easement grant to P.G.& E. merely confirmed an existing easement.

Respondents purchased lot 115 in 1973 to prevent other homes from being constructed on the side of the bluff and blocking their view of the San Joaquin River. At the time respondents purchased lot 115, all of the developed bluff lots, eight in number, were receiving electrical power directly from the main powerline on lot 115. Respondents owned three of these homes at the time they purchased lot 115.

When appellants purchased lot 62 in 1977, the previously developed bluff lots, nine in number, were receiving electricity from the powerline. Both lots adjacent to lot 62, lots 61 and 63, were receiving electricity from the powerline. P.G.& E. had erected a pole within two feet of the northwest corner of lot 62 to suspend the distribution line for lot 61. This pole is within the eight-foot right-of-way reserved for public utilities as specified in paragraph 21 of the recorded restrictions, assuming the right-of-way is on lot 115.

Three days after appellants began construction of their home, respondents informed appellants they would not consent to a trunkline hookup between lot 62 and the powerline on lot 115. Respondents also refused appellants' request to connect into the tie-in line for lot 61 at the pole located near the northwest corner of lot 62. Respondents' action was apparently in retribution to appellants' refusal to put a skyport on their lot. Sierra Sky Park, Inc., is a unique subdivision which contains a small private airport. Many of the lots have skyports for the owners to park their planes.

In December 1977, P.G.& E. orally informed appellants that it would be unable to provide lot 62 with electrical power from any source unless appellants could reach an accord with respondents. As a result, appellants halted further construction until electricity could be provided. Appellants filed a consumer complaint with the Public Utility Commission. On February 13, 1978, P.G.& E. offered to provide lot 62 with electricity from a power pole located approximately 350 feet away. Appellants paid P.G.& E. $1,620 for the cost of digging a trench to lay an electrical cable. If respondents had not interfered with appellants' alleged easement right in lot 115, access to electrical power could have been obtained for no cost. Appellants claim they suffered additional damages in excess of $20,000 due to the delay in construction.

### Discussion

Although no written document expressly gives lot 62 an easement across lot 115 for power purposes, such an easement may be *implied* in the deed of conveyance from the subdivider to the first buyer of lot 62. The implication arises because both the developer, Sierra Sky Park, Inc., and P.G.& E. intended the 1960 powerline right-of-way along the ditch at the bottom of the bluff to replace the 1946 recorded utility easement adjoining the northern boundary of each of

the bluff lots. The developer agreed to the new location of the easement line to minimize the intrusion into the view from the bluff lots, and P.G.& E. agreed to the change because the distance to the bluff lots was "fairly short." Thus, quasi-easements[3] may have existed on lot 115 favoring the bluff lots at the time the developer conveyed the lots including lot 62.

Before the law will recognize an easement by implication, however, the utilization of the easement must be "apparent and continuous" at the time the dominant owner acquires his land. Civil Code section 1104 provides, "A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was *obviously and permanently* used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed." (Italics added.) According to Witkin, this "section states the established principle that, when an owner of two adjoining pieces of land *sells* one of them, or the owner of a piece of land sells a part of it, the purchaser takes the portion sold with all the benefits that appear at the time of the sale to belong to it as between it and the property which the vendor retains." (Italics original, 3 Witkin, Summary of Cal. Law, *supra*, § 355, pp. 2052-2053.) There must be something upon the servient estate which is either visible or in the nature of a permanent artificial structure. (3 Witkin, *op. cit. supra*, § 356, p. 2054.) Powell further explains: "The requirement that the quasi-easement must have been 'permanent,' or 'continuous' means only that the use involved shall not have been occasional, accidental or temporary, but shall have been of such a character as to enable the claimant to rely reasonably upon the continuance of such user. . . ." (Powell on Real Property, *op. cit. supra*, p. 549.)

The reason the easement must be obvious to others is to confirm the intent of the original owner to use part of his land for the benefit of the other part and to give notice to his successors in interest that the future servient estate is burdened with the easement in favor of the future dominant estate.

---

[3]Professor Powell explains the "quasi-easement" concept as follows: "All implications of easements necessarily involve an original unity of ownership of the parcels which later become the dominant and servient parcels. When A owns Blackacre, it is not possible for A as the owner of the west half of Blackacre to have a true easement with respect to the east half of Blackacre; but it is both possible and frequent to find A using the east half of Blackacre for the service of the west half of Blackacre, as for example, when the half of Blackacre contains drains, or sewers, or irrigation ditches, or roadways or stairways which increase the usability of the west half of Blackacre. It is then possible to describe A's utilization of one part of Blackacre for the service of another part thereof as a quasi-easement, and to speak of the served part as the quasi-dominant tenement, and of the burdened part as the quasi-servient tenement." (Powell on Real Property (abridged ed. 1968) pp. 548-549; see also 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 355, pp. 2052-2053.)

The powerline permanently affixed on lot 115 would have been apparent when lot 62 was first conveyed by the subdivider. However, since the powerline may have been intended for purposes other than servicing the bluff lots, its existence *alone* may not have satisfied the "continuous and permanent" requirements of Civil Code section 1109. Nevertheless, there are other facts which would have made the intended easements favoring the bluff lots apparent to the buyer of lot 62: the 1946 subdivision restrictions gave each buyer constructive notice of the utility easement along the rear of the bluff lots; the absence of a powerline at such a location coupled with the powerline located a short distance away on lot 115 rationally would cause an observing buyer to believe the powerline was intended to provide power to lot 62. Thus, a factual question exists whether the quasi-easements intended by the 1960 grant to P.G.& E. for distribution of power were apparent to the buyer of lot 62 when he purchased the lot. If so, the deed from the subdivider to the buyer of lot 62 would include the easement by implication. (3 Witkin, Summary of Cal. Law, *op. cit. supra,* at p. 2054; Powell on Real Property, *op. cit. supra,* at p. 549.)[4]

We are not persuaded by respondents' argument—accepted by the trial court—that the absence of a distribution line running from the powerline to lot 62 precluded an easement by implication to lot 62. As we have explained, the history of the subdivision shows the subdivider intended to provide utility easements to all of the lots in the subdivison; the powerline on lot 115 was intended to replace the 1946 utility easements across the rear of the bluff lots, and all of the developed lots actually tied into the powerline. This raises a strong inference that lot 62 had a similar easement although not asserted until appellants started building their home.

An implied easement is not confined to the precise use at the time of the transfer, i.e., it may have a broader scope than the quasi-easement on which it is based. The test is the intended use *reasonably contemplated* by the parties. For example, in *Fristoe* v. *Drapeau* (1950) 35 Cal.2d 5 [215 P.2d 729], the original grantor constructed a road through a tract. He conveyed one parcel to the plaintiff in 1930 and a contiguous parcel to the defendants in 1946. The road followed the boundary line between the parcels, being partly on plaintiff's and partly on defendant's land. It was held the plaintiff had an implied easement to use the road not only for the original purpose of servicing an orchard but also for access to a proposed residence to be constructed on his parcel away from the roadway. The Supreme Court declared: "The purpose of the doctrine of im-

---

[4]Assuming that one or more bluff lots had tie-ins to the powerline on lot 115 when lot 62 was conveyed by the subdivider, the tie-ins probably would have been apparent to the buyer of lot 62 and would support the implication of an easement to lot 62.

Furthermore, when respondents purchased lot 115 in 1973, all of the developed lots—nine in number—were receiving electric power by tie-ins to the powerline. Respondents therefore were put on notice that lot 115 was burdened with easements in favor of all of the bluff lots.

plied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances. Although the prior use made of the property is one of the circumstances to be considered, easements of access have been implied in this state in situations in which there was no prior use. . . . [Citations.]

"The factors enumerated in section 1104 of the Civil Code are not exclusive of other possible factors which may have a bearing in ascertaining the extent of an easement created by implication. Section 1104, which relates to the creation of easements by implied grant, must be read with section 806 of the Civil Code, which defines the extent of all servitudes, and also in the light of the common law rules governing easements by implication. Section 806 provides that 'the extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired.' Under this section, except in cases of prescriptive rights, the controlling factor is the terms of the grant. *When the grant is implied, its terms must be inferred from all of the circumstances of the case.* The effect of section 806 is to establish intent as the criterion, and this is in accord with the rationale of the rules governing easements by implication.

"The Restatement sets forth the rule as follows: 'The extent of an easement created by implication is to be inferred from the circumstances which exist at the time of the conveyance and give rise to the implication. Among these circumstances is the use which is being made of the dominant tenement at that time. Yet it does not follow that the use authorized is to be limited to such use as was required by the dominant tenement at that time. It is to be measured rather by such uses as the parties *might reasonably have expected from the future uses of the dominant tenement.* What the parties might reasonably have expected is to be ascertained from the circumstances existing at the time of the conveyance. It is to be assumed that they anticipated such uses as might reasonably be required by a normal development of the dominant tenement. . . .' (Rest., Property, § 484, comment b.)" (35 Cal.2d at pp. 8-9, italics added.)

We conclude from the rationale of *Fristoe* v. *Drapeau, supra,* that even though electric power had not been distributed directly from lot 115 to lot 62, the subdivider's 1960 easement grant to P.G.& E. for power distribution purposes in the light of the history of the subdivision would support an easement by implication in the initial conveyance of lot 62. This accords with the intent of the subdivider as the original owner of the dominant and servient estates; this accords with the intent of P.G.& E. which was charged with the public responsibility of providing power to the subdivision lots; and this accords with the apparent intent of the lot owners including respondents. As a successor in interest to lot 62, appellants would have the benefit of such an easement.

At trial, other factual questions may arise concerning an easement across lot 115 for the benefit of lot 62: (1) were any representations made by the

developer to the first buyer of lot 62 that the powerline would service the electric needs of lot 62? As pointed out by Witkin, an easement by implication may arise from representations by the seller or its agents (3 Witkin, *op. cit. supra,* § 358, p. 2055); (2) assuming no express representations, did the subdivider nevertheless know that the buyer of lot 62 intended to use the powerline on lot 115 for power purposes? If so, the subdivider would have been estopped from denying the existence of such an easement although it is not mentioned in the deeds (Powell on Real Property, *op. cit. supra,* at p. 552.) Respondents as successors in interest to the subdivider as the owner of lot 115 would be bound by such an estoppel.

A summary judgment motion shall not be granted unless all of the papers submitted show there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c.) Respondents' failure to negate the factual inferences raised by appellants' declarations and discussed in this opinion renders the entry of the summary judgment in respondents' favor an abuse of discretion.

The judgment is reversed.

Andreen, J., and Stanton, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.