[No. B117050. Second Dist., Div. Three. Mar.' 31, 1999.]

TEACHERS INSURANCE AND ANNUITY ASSOCIATION, Plaintiff and Respondent, v.
ALEX FURLOTTI et al., Defendants and Appellants.

## COUNSEL

Gaims, Weil, West & Epstein, John Gaims and Corey E. Klein for Defendants and Appellants.

Allen, Matkins, Leck, Gamble & Mallory, Charles N. Kenworthy and Rebecca Gilbert Gundzik for Plaintiff and Respondent.

## OPINION

**ALDRICH, J.—**

### INTRODUCTION

Defendants, Alex and Nancy Furlotti, Quorum Properties and Portofino Place (together the Furlottis), owners of a residential apartment building, appeal from the trial court's order granting a preliminary injunction requiring them to remove a fence they erected along the property line between their building and the adjoining commercial property owned by plaintiff, Teachers Insurance and Annuity Association (Teachers). Because Teachers has not demonstrated a reasonable probability it will prevail on the merits at trial, the court below abused its discretion in granting the mandatory preliminary injunction. Accordingly, we reverse the order.

FACTUAL AND PROCEDURAL BACKGROUND

The verified complaint, declarations and exhibits filed in connection with the preliminary injunction hearing disclose essentially undisputed facts. At the center of this controversy is a dead-end alley which runs east-west near the corner of Wilshire Boulevard and Bundy Avenue in Los Angeles and which is accessible only from Amherst Avenue. Measuring 21 feet wide, the alley separates the 14-story commercial office building known as the Wilshire/Bundy Plaza directly to the south, from the Portofino Place Apartments immediately to the north. Formerly public, the alley was officially vacated on April 8, 1983, by ordinance of the City of Los Angeles. The bordering properties each extend to the midpoint of the alleyway.

The alley constitutes the boundary between the commercial zone to the south and the residential zone to the north. (L. A. Mun. Code, § 12.30.F.) The Wilshire/Bundy Plaza, owned by Teachers,[1] and constructed in 1984 by Teachers's predecessor, lies in a C4-1VL commercial zone, and houses businesses and other commercial enterprises. Portofino Place Apartments, a 33-unit apartment building built in 1989, and owned by the Furlottis,[2] lies in the R3-1 multiple dwelling zone. Six of the apartments in the building directly face the alley.

In 1985, the then owner of both properties executed a declaration of reciprocal easement (DRE) covering the alley. Section 3.4 of the DRE granted the right to use the easement, i.e., the alley, solely for access between Amherst Avenue and the service areas of the two buildings, "and for necessary ancillary use *customary to a service driveway for pick-up, delivery, loading, unloading, trash removal, maintenance and ancillary service activities customary to* or for improvements now or hereafter located" on the two properties. (Italics added.) The DRE specifies the service areas are to be used for installation and storage of loading docks, trash collection bins and similar equipment customary to service facilities, and for access to and use of such equipment by service personnel, vendors and suppliers. General vehicular ingress and egress between Amherst Avenue and the parking facilities are otherwise prohibited in the alley. Since 1985, the owners of the two properties have been using the entire alleyway pursuant to the DRE on a daily basis for such purposes.

The commercial building's use of the alley for deliveries, pickup and trash collection, combined with smoking and the noisy workmen in the area

---

[1]Teachers is the ground lessee and owns the improvements known as the Wilshire/Bundy Plaza.

[2]The Furlotti individuals own an interest in Portofino Place, and Quorum Properties is the general partner of Portofino Place. In turn, Portofino Place owns the fee of a portion and is the ground lessee of the remainder of the Portofino Place Apartments.

between midnight and 4:00 a.m., created such noise, smoke, and dirt, that the Furlottis, on behalf of the residents of Portofino Place Apartments, complained to the managers of the Wilshire/Bundy Plaza. These problems commenced as early as 1987, but the number and urgency have greatly increased recently. Although the parties reached an understanding[3] whereby deliveries would occur during the office building's regular business hours, the alley was still used after business hours.

Frustrated with the ever increasing noise and magnitude of Wilshire/Bundy Plaza's use of the property, and despite complaints to the management of the office building, in July 1997, the Furlottis announced their intention to construct a fence in the alley. The manager of the Wilshire/Bundy Plaza responded that such a fence would violate the DRE and demanded the Furlottis desist. Nonetheless, one Sunday in 1997, the Furlottis constructed a chain link fence down the center of the alley. The Furlottis' attorney informed Teachers's attorney that the Furlottis planned to take up the concrete in their portion of the alley and replace it with vegetation to screen the apartments from the office building.

Teachers responded by suing the Furlottis for damages for breach of the DRE, nuisance, and trespass. The Furlottis also sought declaratory and injunctive relief. Simultaneously, Teachers applied for a preliminary injunction to require removal of the fence and repair of the easement area to the condition in which it was prior to erection of the fence.

Teachers' application for injunction was made on the ground that the DRE was an enforceable agreement which entitles the parties to use the easement area for access, but which was violated by the Furlottis when they constructed the fence.

As for irreparable harm, Teachers explained that the alley is critical to the daily operations of the Wilshire/Bundy Plaza whose patrons and tenants rely on it for delivery and service access. The only access to Wilshire/Bundy Plaza's loading dock is through the alley, and parking in front of the building is very limited. The fence has narrowed the alley to such an extent that many service vehicles and suppliers are inconvenienced, blocked, and delayed; certain trucks are unable to gain access to the building; and garbage trucks cannot reach the trash bins. Ten vehicles a day have been unable to use the alley since the fence was erected. Teachers alleged the fence prevented

---

[3]Section 3.6 of the DRE requires the owners of both properties and their successors and assigns, as well as anyone holding an interest in the easement area, to cooperate "[t]o the extent necessary to avoid unreasonable interferences with each party's use of the Reciprocal Easement Area."

Teachers from supplying its tenants with several basic services. In Teachers's words, "[t]his will undoubtedly cause numerous tenants to complain and perhaps even leave the building." Hence, Teachers urged that immediate removal of the fence was necessary to enable Teachers to provide daily services to its tenants.

In reply, the Furlottis took the position the DRE was void *ab initio* and use thereunder illegal because the DRE purported to grant Teachers the right to use for commercial purposes that portion of the alley located on property owned by Portofino Place Apartments which is zoned for residential use only. The Furlottis argued Wilshire/Bundy Plaza's use thus violates the Los Angeles Municipal Code.

As for their irreparable harm, the Furlottis explained, if the injunction were granted Portofino Place Apartments would suffer great injury because the misuse of the residential half of the alley has forced the Furlottis to grant rent abatements and other concessions to keep tenants from leaving the apartments. Still, some tenants moved out. Also, with the injunction, residents would be forced to continue to suffer an unreasonable amount of noise, smoke, dirt, and other nuisances which, the Furlottis feared, would only be exacerbated if the injunction were issued and Teachers were allowed to resume commercial use of the residential half of the alley. By contrast, the Furlottis noted, the commercial half of the alley met the municipal code's requirements for a service driveway. Thus, the Furlottis argued, Teachers is not precluded from using its half of the alley for commercial purposes, even with the fence in place.

After hearing, the court found Teachers had suffered harm and ordered the injunction to issue restraining Portofino Place Apartments from, inter alia, obstructing and interfering in any way with Teachers's ability to utilize any portion of the easement area adjacent to Portofino Place Apartments for the uses described in the DRE. The Furlottis also were enjoined from constructing a wall or fence and from removing any concrete from the easement. The injunction further ordered the Furlottis to remove the chain link fence and building materials from the easement within three business days. In granting the injunction, the court stated, "The bottom line, by the way, is that the self help in my opinion cannot be permitted to remain . . . . [That] self help has to be reversed, pending the trial of this action." The Furlottis' timely appeal followed.

## CONTENTION

 The Furlottis contend the trial court abused its discretion in granting the injunction.

## DISCUSSION

### 1. *Standard of review.*

As Teachers notes, the focus of inquiry is whether Teachers is likely to prevail on the merits.

■ Two interrelated factors are evaluated by the trial court in deciding whether to issue a preliminary injunction. The first is the "reasonable· probability" that the plaintiff will prevail on the merits at trial. (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 206 [211 Cal.Rptr. 398, 695 P.2d 695].) " '. . . The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued.' [Citation.]" (*Shoemaker* v. *County of Los Angeles* (1995) 37 Cal.App.4th 618, 624-625 [43 Cal.Rptr.2d 774].)

"An appeal from an order granting a preliminary injunction involves a limited review of these two factors. . . ." (*Shoemaker* v. *County of Los Angeles, supra,* 37 Cal.App.4th at p. 625.) The decision to grant a preliminary injunction " 'rests in the sound discretion of the trial court.' [Citation.]" (*Id.,* at p. 624.) The decision will only be reversed when the trial court has abused its discretion as to either factor. (*Id.,* at p. 625.) " 'A trial court will be found to have abused its discretion only when it has " 'exceeded the bounds of reason or contravened the uncontradicted evidence.' " ' [Citation.] 'Further, the burden rests with the party challenging the [trial court's ruling on the application for an] injunction to make a clear showing of an abuse of discretion.' [Citation.]" (*Id.,* at p. 624.)

■ We emphasize that " ' "[a] preliminary *mandatory* injunction is rarely granted, and is subject to stricter review on appeal." ' [Citation.] The granting of a mandatory injunction pending trial ' "is not permitted except in extreme cases where the right thereto is clearly established." ' [Citation.]" (37 Cal.App.4th at p. 625, italics added, fn. omitted.)

With these rules in mind, we turn to the issue presented.

### 2. *Teachers has no reasonable probability of success on the merits.*

*Wilshire/Bundy Plaza's use of the easement area is commercial in nature and violates the municipal code.*

■ Teachers' application for preliminary injunction was premised on the easement which granted the parties the right to use each other's half of

the alley. Teachers insisted the Furlottis should be enjoined from preventing Teachers from using the easement to gain entry to its loading docks. In their appeal, the Furlottis contend, as they did below, that Teachers cannot prevail at trial because the easement is invalid. The Furlottis argue the easement purports to grant commercial use of Portofino Place Apartments's portion of the alley which is zoned for residential use only with the result the use is a zoning violation. The Furlottis are correct.

Turning first to the Los Angeles Municipal Code (hereinafter the municipal code), section 12.03 defines an accessory use as "[a] *use which is customarily incidental to that of the main building* or to the main use of the land *and* which is *located in the same zone or a less restrictive zone and on the same lot with a main building* or use." (Italics added.) Applying that definition to this case, an accessory use by a commercial building, such as Wilshire/Bundy Plaza, on its own property is commercial. However, Wilshire Bundy Plaza's accessory use here is employed on the Portofino Place Apartment's property, not on its own property. Section 12.21.C.5.(h) provides in relevant part, "*No accessory* building or *use* shall be located on a property in a more restrictive zone than that required for the main building or main use to which it is accessory." (Italics added.) R3 is a more restrictive zone than C4. (Mun. Code, § 12.23.B.1.(c).)

Based on the municipal code, the Furlottis argue because Wilshire/Bundy Plaza is a commercial building on property zoned C4, its accessory use for access is commercial with the result that its use of the residentially zoned portion of the alley is prohibited. Teachers counters that the municipal code contains no definition of "commercial use" and so Teachers is not prohibited from employing the entire alley for access.

*City & Co. of S. F.* v. *Safeway Stores, Inc.* (1957) 150 Cal.App.2d 327, 332 [310 P.2d 68, 63 A.L.R.2d 1441] (hereinafter *Safeway*), is the only California case, yielded by research, that defines accessory use by reference to the parcel employing the use. There, a common grantor created a traffic easement over a residential portion of a tract. A fence was removed thereby connecting the supermarket's parking lot to the easement. Over time, use of the easement increased to the point where not only did some drivers use the easement as a cutoff and thence as access to and through the parking lot, but trucks and suppliers of service to the Safeway store frequently used the easement for ingress and egress. By the time of the lawsuit, "[t]he easement [was] used as a thoroughfare." (*Id.*, at p. 329.) The court addressed the question whether "the use of a traffic easement in a residential zone for purposes of ingress and egress to a parking lot on mercantile store premises by the general public, delivery trucks, etc., [is] a violation of zoning

restrictions." (*Id.*, at p. 328.) After reviewing cases from other jurisdictions, the *Safeway* court held public "parking is an essential and integral part of the store's business." (*Id.,* at p. 332.) "A large number of trucks daily visit such stores bringing fresh supplies. *Thus the use of property zoned for residence* for the vast amount of *public ingress and egress necessarily connected with a store of the Safeway type, is a violation of a residential zoning ordinance.*" (*Ibid.*, italics added.) *Safeway* thus suggests the accessory use connected with a mercantile business is mercantile.[4]

We are further persuaded by decisions from other jurisdictions which hold, as *Safeway* does, that the use of land in a residentially zoned district to gain access to land or buildings in a commercially zoned area constitutes a commercial use in violation of the zoning restrictions of the residential district. (*City of Providence* v. *First National Stores, Inc.* (1965) 100 R.I. 14, 18 [210 A.2d 656, 659]; *Beale* v. *Planning Bd. of Rockland* (1996) 423 Mass. 690, 694 [671 N.E.2d 1233, 1236] ["Use of land in one zoning district for an access road to another zoning district is prohibited where the road would provide access to uses that would themselves be barred if they had been located in the first zoning district. In such a situation, *the access is considered to be in the same use as the parcel to which the access leads.* [Citations.]" (Italics added.)]; *Town of Brookline* v. *Co-Ray Realty Co.* (1950) 326 Mass. 206, 211-212 [93 N.E.2d 581, 582-584]; *Dupont* v. *Town of Dracut* (1996) 41 Mass.App. 293, 297 [670 N.E.2d 183, 185-186] [town has right to prohibit accessory use (access and parking) to use (residential) not permitted in that district]; *Ferris* v. *City of Las Vegas* (1980) 96 Nev. 912, 914 [620 P.2d 864, 865] [use of driveway in residential district for access to business zone is commercial use in violation of zoning laws]; *City of Yonkers* v. *Rentways, Inc.* (1952) 304 N.Y. 499, 503-504 [109 N.E.2d 597, 599] [Use of garage in residential district for business purpose violates residential zoning. "And it can hardly be denied that the day in, day out moving of vehicles across private land from a public street to the shelter of a garage building is part of the business of garaging vehicles."].)

Teachers notes the Furlottis have not identified any activity by Teachers which would not also be accessory to the Furlottis' R3 multi-dwelling-zoned

---

[4]Teachers argues *Safeway* "did not provide any definition of the conduct which constitutes a 'commercial use.' " To the contrary, *Safeway* described the conduct of the commercial user of the residential property (shoppers' automobiles parking on store grounds and a "large number" of trucks "daily" supplying the stores) and declared that such conduct violated the residential zoning ordinance. (150 Cal.App.2d at p. 332.) Teachers also misunderstands *Safeway* when it argues *Safeway* "based its decision upon the premise that the defendant's violation of the zoning ordinances constituted a public nuisance and was injurious to the general public." The opinion was presented in two parts: it first addressed whether the use of the property constituted a commercial use in violation of zoning and then turned to the question whether that use constituted a nuisance. (*Id.*, at pp. 328, 332.)

property. The easement allows loading and unloading, mail delivery and trash collection, all of which occur on any type of residential property. Thus, Teachers argues, because its use of the easement is exactly the same type as that of Portofino Place Apartments, its use of the residential side of the alley does not violate the municipal code. We disagree. Quite apart from the fact that the municipal code and case law define the use by reference to the main parcel with the result that Wilshire/Bundy Plaza's use of the easement is necessarily commercial, Teachers' argument overlooks the fact that it is not just the *kind* but the *magnitude* of use in question which offends. That is, the amount and timing of pick up and delivery connected with a 14-story commercial building is simply not the same as that associated with a residential apartment building. Indeed, *Safeway* noted this fact when it considered what it called "the vast amount of public ingress and egress necessarily connected with a store of the Safeway type" which violated the restrictions of a residential zone. (*Safeway, supra,* 150 Cal.App.2d at p. 332.)[5]

Based on the municipal code and on *Safeway,* as well as on the cases from other jurisdictions, we conclude that Wilshire/Bundy Plaza's use of the Portofino Place Apartments' residential half of the alley is commercial in nature and thus violates section 12.21.C.5.(h) of the municipal code which prohibits a "use . . . on a property in a more restrictive zone," such as R3. (Mun. Code, § 12.23.B.1.(c).)

### 3. *The DRE cannot be used to circumvent zoning restrictions.*

Having concluded Wilshire/Bundy Plaza's accessory use is commercial in nature in excess of that which the municipal code allows on residential property, we turn to the question of whether the DRE can grant by private agreement that which is prohibited by zoning. We conclude it cannot.

■ Zoning ordinances are enacted by municipalities through the exercise of their police power. (*City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442, 450 [274 P.2d 34].) "The police power is not restricted to the suppression of nuisances. It includes the regulation of the use of property to the end that the public health, morals, safety, and general welfare may not be impaired or endangered." (*Id.,* at p. 451.) Under the police power, municipalities have the authority "to establish and maintain residential and quasi-residential districts, and to exclude therefrom all nonconforming and conflicting uses. [Citation.]" (*Ibid.*)

---

[5]We also reject Teachers' argument that because commercial traffic is allowed on all public streets in a residential zone, the alley here should be available for Wilshire/Bundy Plaza's commercial accessory use. It goes without saying that what is allowed on public streets is irrelevant to a determination of what is allowed on nondedicated alleys and driveways which are subject to zoning restrictions.

The exercise of police power may not "be limited by private contract" or restrictive covenants. (*Acker* v. *Baldwin* (1941) 18 Cal.2d 341, 345 [115 P.2d 455]; *Wheeler* v. *Gregg* (1949) 90 Cal.App.2d 348, 367 [203 P.2d 37].) Private agreements as to the use of property are immaterial to the validity of a particular zoning ordinance. (*O'Rourke* v. *Teeters* (1944) 63 Cal.App.2d 349, 352 [146 P.2d 983].)

The question whether private agreements may supersede zoning restrictions was also raised in *Safeway* where the Safeway owner appeared to argue the right to pass over the easement was superior to San Francisco's zoning restrictions. (*Safeway, supra,* 150 Cal.App.2d at p. 332.) The argument was rejected with the following explanation: "This is not a case, as [*Safeway*] seems to consider it, of a question of the rights of the owner of a dominant tenement over the owners of servient tenements. There is no question of defendant's ownership of an interest in the traffic easement. . . . *The question here is concerning [Safeway's] right to use its interest in violation of a zoning ordinance. The trial court properly held that [Safeway] had no right to do so.*" (*Ibid.,* italics added, fn. omitted.)

Insofar as the DRE purported to grant the owners of the Wilshire/Bundy Plaza property the right to use the residentially zoned half of the alley for commercial purposes, it improperly granted rights which are prohibited by the municipal code. Therefore, Teachers cannot rely on the DRE to utilize the residential half of the alley.[6]

### 4. *Self-help.*

Teachers argues here, as it did below, that the mandatory injunction should issue in any event because erecting the fence was an improper resort to self-help. The trial court considered whether Teachers had suffered harm and granted the application for preliminary injunction declaring self-help should not be allowed. We conclude the trial court abused its discretion in ordering the injunction to issue without considering the likelihood of Teachers' success on the merits.

---

[6]We observe, however, Teachers does not lose all access to its loading docks in the alley as a consequence of our holding. The easement is invalid insofar as it purports to grant Teachers the right to use that half of the alley which is zoned residential. Nonetheless, based on the facts presented, Teachers is not prevented from using the alley altogether, nor is Teachers entirely prevented from providing necessary services to Wilshire/Bundy Plaza. For example, the evidence shows that Teachers' half of the alley is 10 feet wide with an additional 2 feet, more or less, of sidewalk space. Teachers' half of the alley thus more than meets the ordinance's requirements for a service driveway even without resort to the Portofino Place Apartments half of the easement. (Mun. Code, § 12.21.A.5.(f).) Furthermore, service trucks also have access to the building from the two public roads which border it. Finally, Teachers might be able to obtain a solution by way of a variance.

As previously noted, trial courts must evaluate *two* factors in determining whether to grant a preliminary injunction application: the probability of the plaintiff's success on the merits at trial, and the comparative harm the parties are likely to sustain as the result of the court's decision. (*Robbins* v. *Superior Court, supra,* 38 Cal.3d at p. 206; *Shoemaker* v. *County of Los Angeles, supra,* 37 Cal.App.4th at pp. 624-625.) The relationship of these two factors is such that " '[a]n injunction should not issue where there is no possibility of success even though its issuance might prevent irreparable harm.' " (*Scates* v. *Rydingsword* (1991) 229 Cal.App.3d 1085, 1096 [280 Cal.Rptr. 544].) Trial courts must evaluate the possibility of success on the merits.[7] Thus, even if Furlotti resorted to self-help, if Teachers cannot prevail on the merits at trial the injunction application should not have been granted.[8]

### 5. *Conclusion.*

To summarize our holding here, where the Wilshire/Bundy Plaza is a commercial property, any access thereto is a commercial accessory use. To the extent that the DRE granted the owner of the Wilshire/Bundy Plaza the right to use the portion of the alley located in a residential zone for commercial purposes, it granted a right in excess of that which is lawful under the City of Los Angeles Municipal Code. Teachers cannot rely on the easement as authority for using the Furlottis' half of the alley. As a result, there was no evidence before the trial court indicating that Teachers has a "reasonable probability" (*Robbins* v. *Superior Court, supra,* 38 Cal.3d at p. 206) of prevailing at trial in their attempt to enforce the easement.[9] Finally, the Furlottis' resort to self-help was not a proper ground for issuing the injunction where Teachers has no reasonable probability of success on the merits. Therefore, the trial court abused its discretion in granting a preliminary injunction.

---

[7]In *Bennett* v. *Lew* (1984) 151 Cal.App.3d 1177 [199 Cal.Rptr. 241], the defendant constructed a fence down the center of a driveway over which the plaintiff claimed an easement by prescription. In affirming the issuance of the preliminary injunction requiring the defendant to remove the fence, the *Bennett* court concluded the evidence supported the determination *the plaintiff was likely to prevail on the merits at trial on the issue of whether the plaintiff had satisfied the elements of a prescriptive easement.* Only after addressing the requisite factors for granting a preliminary injunction, did the *Bennett* court consider whether the plaintiff should be denied equitable relief on the ground of unclean hands because the plaintiff had exercised self-help. (*Id.,* at p. 1186.)

[8]The cases on which Teachers relies, *Daluiso* v. *Boone* (1969) 71 Cal.2d 484 [78 Cal.Rptr. 707, 455 P.2d 811], and *Allen* v. *McMillion* (1978) 82 Cal.App.3d 211 [147 Cal.Rptr. 77], are distinguished because neither case involved the issuance of a preliminary injunction.

[9]Given our conclusion here, we need not reach the second factor courts must consider in determining whether to order an injunction, namely the relative harm the parties may suffer. (*Scates* v. *Rydingsword, supra,* 229 Cal.App.3d at p. 1096.)

## DISPOSITION

The order is reversed. Appellants awarded costs on appeal.

Klein, P. J., and Croskey, J., concurred.