Filed 11/1/22  Gaffney v. Drolet CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KATHLEEN G. GAFFNEY,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>JEAN DROLET,<br><br>     Defendant and Respondent. | A163419<br><br>(Solano County<br>Super. Ct. No.<br>FCS052125) |

This is a case between two neighbors, one of whom sought to establish an implied easement for a sewer line running under the other's property.[1]

The owner of the allegedly servient property, defendant Jean Drolet, was not aware of the sewer line when he purchased his property. He became aware of it several months later when sewage started oozing to the surface of his property. There is no dispute the antiquated line is in ill repair and needs to be replaced, and its current placement does not comply with local building requirements or the state Plumbing Code.

---

[1] Technically, this line is a sewer "lateral," the pipe that runs from a service location, such as a house, to the public sewer main. (See <vallejowastewater.org/DocumentCenter/View/713/Upper-Lateral-Fact-Sheet-PDF> [as of Nov. 1, 2022].) For ease of reference, we refer to the line at issue as simply a sewer line.

1

Drolet subsequently applied for, and received, approval to make major repairs to his 100-year-old house and to raise it to add a garage and auxiliary dwelling unit. He cannot commence the work, however, because the old sewer line runs too close to the foundation of the house.

The owner of the allegedly dominant property, plaintiff Kathleen Gaffney, opposed Drolet's improvement application at every step, and when Drolet demanded that she remove the sewer line so he could commence work, she refused and sued him to establish an implied easement for the line.[2]

Drolet, in turn, cross-complained for nuisance, trespass, and quiet title, and sought injunctive relief.

After a four-day bench trial, the court ruled against Gaffney and in favor of Drolet. Observing that the parties had been haggling over the sewer line for more than five years, the court quieted title in favor of Drolet and issued injunctive relief requiring Gaffney to stop using the sewer line "in a manner that impedes [Drolet] from improving [his] property," and ordered Gaffney to relocate the sewer line off the Drolet property.

Gaffney appeals, claiming she proved each of the requirements for an implied easement and the trial court committed legal errors in its assessment of the evidence. She further maintains the court erred in invalidating an easement shown on the parcel map creating the adjoining properties and in granting injunctive relief. We reverse the invalidation ruling but affirm in all other respects.

---

[2] She alternatively sought to establish an equitable easement but does not pursue that theory on appeal.

## DISCUSSION[3]

*The Law Governing Implied Easements*

"Under certain circumstances, the law implies that the parties intended to create or transfer an easement by a grant or reservation when there is no written document evidencing their intent and, in some cases, even when there is no oral agreement regarding the easement; thus, implied easements are 'an exception to the general rule that interests in real property can only be created by an express writing or prescription.' "[4] (*Romero v. Shih* (2022) 78 Cal.App.5th 326, 349 (*Romero*), rev. granted Aug. 10, 2022, S275023, quoting *Kytasty v. Godwin* (1980) 102 Cal.App.3d 762, 768 (*Kytasty*).)

"The factual circumstances that permit the creation of implied easements are fairly well established and the implication can only arise where certain facts are present." (*Romero, supra,* 78 Cal.App.5th at p. 349.) An "easement will be implied when, at the time of conveyance of property, the following conditions exist: 1) the owner of property conveys or transfers a portion of that property to another; 2) the owner's prior existing use of the

---

[3] We address the pertinent facts in connection with our discussion of the issues on appeal.

[4] The doctrine of implied easements arises from Civil Code section 1104, which states: "easements pass with property[:] [¶] A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed." Although this section "speaks only in terms of implying an easement in favor of the grantee . . . [t]he implied easement or quasi-easement authorized by Civil Code section 1104 is reciprocal; hence, if a burden has been imposed upon a parcel of land sold, the purchaser, provided the marks of this burden are open and visible, takes the property with the servitude on it." (*Kytasty, supra,* 102 Cal.App.3d at p. 770.)

property was of a nature that the parties must have intended or believed that the use would continue; meaning that the existing use must either have been known to the grantor and the grantee, or have been so obviously and apparently permanent that the parties should have known of the use; and 3) the easement is reasonably necessary to the use and benefit of the quasi-dominant tenement." (*Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 141 (*Tusher*); accord, *Thorstrom v. Thorstrom* (2011) 196 Cal.App.4th 1406, 1419–1420 (*Thorstrom*); *Kytasty, supra,*102 Cal.App.3d at pp. 768–769.)

" 'In order for an easement to arise by implication, it must be both apparent and continuous, or obvious and permanent. [Citation.] An easement which is apparent and continuous will pass as appurtenant without use of the word "appurtenances"; but if it is not apparent and continuous, it is not included in the conveyance unless the grantor uses language in his deed sufficient to create the easement. . . . An apparent or obvious easement is one that is visible on [or from] the servient estate.' " (*Kytasty, supra,* 102 Cal.App.3d at pp. 770–771, quoting *Swarzwald v. Cooley* (1940) 39 Cal.App.2d 306, 324–325; see *Zanelli v. McGrath* (2008) 166 Cal.App.4th 615, 635 ["An implied reservation of an easement may be inferred only where there is an obvious ongoing use that is reasonably necessary to the enjoyment of the land granted."].)

"The requirement that the easement must be ' "reasonably necessary to the beneficial enjoyment" of the property conveyed means no more than "for the benefit thereof," ' " and a party seeking to establish an implied easement is not required to prove that the easement as it existed was a strict necessity or " 'the only possible way' " of accommodating the use. (*Thorstrom, supra,* 196 Cal.App.4th at pp. 1420–1421.)

4

" 'The law does not favor the implication of easements.' " (*Kytasty, supra,* 102 Cal.App.3d at p. 769; *Thorstrom, supra,* 196 Cal.App.4th at p. 1420; *Sierra Screw Products v. Azusa Greens, Inc.* (1979) 88 Cal.App.3d 358, 368.) Thus, " '[w]hether an easement arises by implication on a conveyance of real estate depends on the intent of the parties, which must clearly appear in order to sustain an easement by implication. In order to determine the intent, the court will take into consideration the circumstances attending the transaction, the particular situation of the parties, and the state of the thing granted. [Citation.] The purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances.' " (*Kytasty,* at p. 769; accord, *Thorstrom,* at p. 1420; *Tusher, supra,* 68 Cal.App.4th at pp. 141–142, ['The purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances.' [Citation.] An easement by implication will not be found absent clear evidence that it was intended by the parties."].)

"The party claiming an implied easement has the burden of proving each element of the cause of action by a preponderance of the evidence, and the factual findings of the trial court are binding on the appellate court if supported by substantial evidence. [Citations.] The court looks to all facts, the situation of the parties and the properties, and the circumstances surrounding the transaction to determine, as a question of fact, whether the parties intended to create the easement."[5] (*Romero, supra,* 78 Cal.App.5th at p. 348.)

---

[5] Gaffney devotes some of her briefing to discussing the summary judgment proceedings that preceded trial and asserts the trial court correctly applied the law in that context but not at trial. This discussion is neither material nor helpful. At this juncture, the task before us is to determine

With this overview of the law in mind, we turn to the trial court's findings on the requirements necessary to establish an implied easement.

### *Original Unity of Ownership*

There is no dispute that Gaffney's and Drolet's properties were originally a single, larger parcel that was previously owned by Richard and Christina Lemke.

### *Nature of Use and Parties' Intent*

Gaffney sharply disputes, however, the sufficiency of the evidence to support the trial court's finding against her on the second requirement—that "the owner's prior existing use of the property was of a nature that the parties must have intended or believed that the use would continue; meaning that the existing use must either have been known to the grantor and the grantee, or have been so obviously and apparently permanent that the parties should have known of the use." [6] (*Tusher, supra,* 68 Cal.App.4th at p. 141.)

Gaffney called no witness who was personally present at the time the Lemkes subdivided their property and sold the parcel Gaffney now owns to a third party. The trial court therefore examined the circumstantial evidence,

---

whether the trial court correctly understood the law and whether its judgment against Gaffney, based on a fully developed record, is supported by substantial evidence.

[6] " ' "Under the substantial evidence standard of review, we review the entire record to determine whether there is substantial evidence supporting the jury's factual determinations [citation], viewing the evidence and resolving all evidentiary conflicts in favor of the prevailing party and indulging all reasonable inferences to uphold the judgment [citation]. The issue is not whether there is evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact." ' " (*Verrazono v. Gehl Co.* (2020) 50 Cal.App.5th 636, 652.)

presented largely by Drolet. This evidence showed the following chain of events:

In 1990, the Lemkes sought approval to subdivide their property into two parcels, each with a house more than 100 years old.

Their application was reviewed by the Vallejo Sanitation and Flood Control District (Sanitation District) which imposed development acceptance requirements, including the following:

"2. This project shall comply with District standards and design criteria unless specifically stated otherwise. [¶] . . . [¶]

"15. Non-District facilities serving more than one lot will not be allowed.

"16. Rear yard facilities serving more than one lot will not be allowed.

"Comment: [¶] . . . [¶] Each lot shall drain and sewer separately to the public system."

The City of Vallejo, in turn, approved the subdivision application subject to numerous conditions, including the following:

"4. Each lot shall have its own water and sewer service. [¶] . . . [¶]

"15. Meet all requirements of [the Sanitation District] as regards sewer lines and drainage."

The city advised Lemke, however, it "would not require that all work be completed before the subdivision was processed and the parcel map recorded."

In accordance with the conditions imposed on the subdivision, the Lemkes filed a parcel map showing a ten-foot easement for a sewer line for the parcel that was eventually sold to Gaffney. The depicted easement runs alongside the new boundary line separating the two parcels, on the parcel

7

eventually sold to Drolet, and out toward the street. Thus, the depicted easement is not in the locale of the old sewer line running through Drolet's property and alongside the foundation of his house. The owner's statement on the parcel map specifically refers to the depicted easement as follows: "The undersigned . . . hereby state that they are the only entities having any record title in all the land delineated within . . . this parcel map, and hereby consent to the preparation and recordation of said map **and hereby reserve for the use of Parcel A, the ten (10) foot wide sanitary sewer easement across Parcel B as shown hereon**." (Capitalization omitted, boldface added.)

About three weeks after the Lemkes filed the parcel map, they conveyed Parcel A (the parcel eventually sold to Gaffney) to the architect who handled their subdivision application, Donald Hardy. The deed to Hardy, as has every subsequent deed of the lots, described the property by reference to the parcel map.

At the same time, the Lemkes applied to the Sanitation District for a connection permit. In the "for District use only" (capitalization omitted) section of the application, the following notation appears: "New lateral to separate 602 Georgia [Parcel B] & 810 Sutter [Parcel A] Streets, existing roof drains must be disconnected from existing service." There was a field check, and three days later, the permit issued. A retired engineering technician for the District testified that, at that time, "the field people used to check to make sure it made sense for the homeowner to connect in a certain place."[7]

_____

[7] While Gaffney points to testimony she asserts indicates inspections were done only on completion, suggesting a new sewer line was installed, the technician's testimony is equally, if not more, supportive of the fact that at the time in question, field checks were done before construction "to make sure" the connection to the main line would be at an appropriate location.

8

Although the permit was issued, the work was never done. No evidence was introduced as to why that was the case.

Given this evidence, the trial court found Gaffney did not carry her burden of establishing that the Lemkes and Hardy intended to create an easement for the existing sewer line. To the contrary, the court found this evidence showed no such intent. As the court pointed out, the evidence established that the subdivision was conditioned on discontinuing use of the existing, inter-connected sewer lines and installing separate lines to service each of the parcels. The evidence also indicated the Lemkes intended to comply with these requirements, as shown by their Parcel Map depicting a sewer easement in a locale that would comply with the regulatory conditions imposed by the city and Sanitation District, and by their application for a connection permit. The court further pointed out there was no evidence the Lemkes made deliberate misstatements to the regulatory authorities or intended to create an unlawful subdivision. While it was true neither the Lemkes nor Hardy ever complied with the parcel map conditions and regulatory requirements, the trial court found this was "more likely than not" because the city never followed up and enforced the map and regulatory requirements. Thus, the court found "that the only credible evidence of Lemke's intent at the time of subdivision of the lots" was the subdivision documentation, which evidenced an intent "to relocate" the sewer line.

The court went on to consider whether the sewer line was so "obviously and apparently permanent that the parties should have known of the use or location." (Boldface omitted.) The court first observed that while the Lemkes and Hardy may have known the sewer line for the house on Lot A (sold to Hardy and eventually to Gaffney) ran through Lot B (retained by the Lemkes and eventually sold to Drolet), there was no evidence they knew where the

9

line was actually located.  There was also "nothing on" Lot B "that was either visible or in the nature of a permanent artificial structure."  The court further observed the "fact that the sewer pipe has repeatedly failed further bolsters the fact that the pipe is not a permanent structure."  Thus, the court distinguished *George v. Goshgarian* (1983) 139 Cal.App.3d 856 (*George*), in which the appellate court concluded there were triable issues of fact as to whether there was an implied easement for power lines and reversed a summary judgment that there was no such easement.  (*Id.* at p. 857.)  Notably, in *George* there were visible transmission lines both on and off the servient property that could support a finding that the alleged implied easement was "obvious to others."  (*Id.* at p. 860.)

Gaffney claims that, contrary to the court's findings, she indisputably established the second requirement.  She maintains the second requirement is met if there is something on the servient property that is " '*either* visible *or* in the nature of a permanent artificial structure' " and the trial court erred as a matter of law in holding "a cast iron sewer lateral 'is not a permanent structure.' "  She points to (a) the order denying summary judgment that assertedly stated the old existing line " 'is in the nature of a permanent artificial structure' " and Gaffney would be required to prove at trial " 'it was used regularly' " and (b) a stipulation at trial that the old line "had been continuously used . . . since the home [on Parcel A] was constructed in 1890."  She focuses on the trial court's comment that the regular failures of the sewer line " 'bolsters' " the conclusion the line is "not a 'permanent structure,' " and maintains the court confused "permanence of the artificial structure itself" and "permanence of *its* use," the latter being the legally significant point.

To begin with, and as we have noted, Gaffney's discussion of the summary judgment ruling is immaterial. At this juncture, we are reviewing a judgment based on a fully developed trial record.

Furthermore, at bottom, Gaffney's argument is that the trial court should have disregarded all the other evidence which we have recounted above bearing on the parties' intent at the time the Lemkes subdivided their property and sold Lot A to Hardy, and should have, instead, considered *only* two facts—that there was an iron sewer line running through Lot B (but no evidence anyone knew where) and the line had, for a century, serviced the house on Lot A. Indeed, Gaffney insists that the trial court erred in "requiring additional evidence of Lemke's intent" beyond these two facts. (Italics omitted.)

Contrary to Gaffney's claim, *intent* is the pivotal issue. "We reiterate that an easement cannot be implied absent clear evidence that one was intended by the parties." (*Tusher, supra,* 68 Cal.App.4th at p. 143.) The "only pertinent question" is whether "based upon the facts and circumstances at the time of the original transfer of the property . . . what did the [transferor] intend?" (*Ibid*.) " ' "In order to determine the intent, the court will take into consideration the circumstances attending the transaction, the particular situation of the parties, and the state of the thing granted." ' " (*Thorstrom, supra,* 196 Cal.App.4th at p. 1420.)

Whether the sewer line was permanent or visible were simply two of the facts, among many others, the trial court properly considered in determining the parties' intent relative to the creation of an easement. And as set forth in detail above, the record contains substantial evidence that at the time of the lot split, the parties did not intend to create an easement for

11

the sewer line in the same location. Indeed, the evidence showed they intended that the sewer line be moved and placed in a different location.

### Reasonable Necessity Test

Gaffney also claims the trial court "misapplied" the reasonable necessity test in finding the " 'existing location [of the sewer line] is not reasonably necessary.' " She maintains the court found " 'no doubt' " that "the Existing Lateral was reasonably necessary at the time of the 1991 grant," and therefore erroneously "required [her] to prove that if she replaces the sewer lateral today . . . its current location would be 'reasonably necessary.' " (Italics & boldface omitted.)

Gaffney misstates the court's finding. The court found "There is no doubt that the existence of *a* lateral servicing 810 Sutter is reasonably necessary for [Gaffney] to enjoy her property. However, the Court finds [Gaffney] failed to establish by a preponderance of [the] evidence that utilizing the *existing location* to replace her 810 Lateral is reasonably necessary. While [Gaffney] testified at length as to the historic nature of the neighborhood and her desire to maintain the historic appearance, she did not offer any credible evidence that the relocation of the 810 Lateral would interfere with the historic nature of the neighborhood."[8] (Italics added.) In short, Gaffney conflates whether "a lateral servicing 810 Sutter" is

---

[8] The parties do not dispute the current sewer line must be replaced. The trial court found the evidence "abundant and undisputed" that the sewer line is "in very poor condition and has deteriorated to the point that it has previously cracked, failed, broken, collapsed, leaked and backed up due to the age of the pipe and to roots and other debris obstructing the flow." Indeed, a retired Vallejo engineering technician evaluated the sewer line and gave it a failing " 'grade,' " qualifying Gaffney for participation in Vallejo's sewer lateral reimbursement program.

" 'reasonably necessary to the beneficial enjoyment' " of her property with whether the existing location of that sewer line is reasonably necessary.

Although she claims the trial court should have found the sewer line in its existing location "was reasonably necessary at the time of the 1991 grant," she offered no evidence of any such reasonable necessity. Indeed, the evidence was all to the contrary. Maintaining the line at its existing location was contrary to the parcel map conditions, contrary to the Sanitation District's subdivision acceptance requirements, and contrary to the City's conditions of approval of the subdivision. Gaffney's testimony about the historic nature and appearance of her home and the neighborhood, and her desire to maintain their historic character, simply did not pertain to the reasonable necessity of the *location* of the sewer line. As the trial court found, Gaffney "did not offer any credible evidence that the relocation of the [sewer line] would interfere with the historic nature of the neighborhood."

In sum, substantial evidence supports the trial court's determination that Gaffney failed to carry her burden of establishing an implied easement for a sewer line at its historic location.[9]

### Quiet Title and Permanent Injunction

The trial court went on to find that the location of the easement specified on the parcel map "violates [California] Plumbing Code § 721.1,"[10]

---

[9] We therefore need not and do not reach Gaffney's challenge to the ruling against her on private nuisance, since she asserts that ruling must be reversed only "[i]n the event Gaffney has an implied easement."

[10] Section 721.1 of the California Plumbing Code provides in part: "Except as provided in subdivision 721.2, no building sewer shall be located in a lot other than the lot that is the site of the building or structure served by such sewer nor shall a building sewer be located at a point having less than the minimum distances referenced in Table 721.1." (Cal. Code Regs., tit. 24, § 721.1)

13

and on that basis, the court extinguished the easement and ordered Gaffney to relocate her sewer line off of Drolet's property. The judgment therefore "enjoined [Gaffney] from continued occupation and use of the Drolet Property for the 810 Lateral servicing the 810 Sutter property and to stop using the sewer in a manner that impedes cross-complainants from improving their property. The Court grants quiet title against all adverse claims of . . . Gaffney. Gaffney has thirty (30) days from entry of judgment to complete an application for relocation of the 810 Lateral off the Drolet Property, consistent with Mr. Hunter's Option No. 1 in Exh. 127. . . . Once Gaffney's application to relocate the lateral off the Drolet Property is approved by [Vallejo Flood and Wastewater District] and the City [of Vallejo], Gaffney has sixty (60) days to complete the work after approval by all agencies having jurisdiction over this project." (Capitalization omitted.)

Gaffney maintains the trial court erroneously "extinguish[ed] the Paper Easement" (i.e., the easement shown on the Parcel Map). (Boldface omitted.) She asserts none of the requirements for the extinguishment of easements set forth in Civil Code section 811 were met.[11] She further asserts the court

Section 721.2 provides in part: "Nothing contained in this code shall be construed to prohibit the use of all or part of an abutting lot to: (1) Provide access to connect a building sewer to an available public sewer where proper cause and legal easement, not in violation of other requirements, has been first established to the satisfaction of the Authority Having Jurisdiction." (Cal. Code Regs., tit. 24, § 721.2.)

[11] Civil Code section 811 provides: "A servitude is extinguished: 1. By the vesting of the right to the servitude and the right to the servient tenement in the same person; 2. By the destruction of the servient tenement; 3. By the performance of any act upon either tenement, by the owner of the servitude, or with his assent, which is incompatible with its nature or exercise; or, 4. When the servitude was acquired by enjoyment, by disuse thereof by the owner of the servitude for the period prescribed for acquiring title by enjoyment." (Civ. Code, § 811.)

14

"took it a step too far and directed precisely where her new lateral must be located," claiming she should have the option of placing her sewer line in the easement shown on the parcel map.

Drolet claims the parcel map easement cannot be enforced because it violates the California Plumbing Code, relying on *Baccouche v. Blankenship* (2007) 154 Cal.App.4th 1551 (*Baccouche*) and *Teachers Ins. & Annuity Assn. v. Furlotti* (1999) 70 Cal.App.4th 1487 (*Teachers*).

In *Baccouche*, the predecessor of the owner of the servient property granted an exclusive easement to the neighboring landowner allowing use of three-quarters of an acre of the property for the "keeping and enjoyment of horses." (*Baccouche, supra,* 154 Cal.App.4th at p. 1553.) However, a Los Angeles ordinance allowed the keeping of horses only on a property " 'in conjunction with the residential use of the lot,' " and there was no residence on the servient property. (*Id.* at p. 1554.) Accordingly, the new owner maintained the easement was void. (*Id.* at p. 1557.) The Court of Appeal affirmed the trial court's ruling that the easement, itself, was valid. However, it reversed the lower court's ruling that the owner of the dominant property could enforce the easement, given that keeping horses on the servient property violated the zoning ordinance. (*Id.* at p. 1559.) The appellate court explained, "whether the grantee could actually use the property for the purposes stated in the easement was subject to compliance with any applicable laws and ordinances, including zoning restrictions. Land use restrictions limiting use of property and a fee owner's consent to such use are quite distinct." (*Id.* at p. 1558.)

The parties in *Teachers* shared an alley between their properties. (*Teachers, supra,* 70 Cal.App.4th at p. 1490.) Furlotti's property had a residential apartment building, while Teachers' property was a commercial

15

office building.  (*Ibid*.)  The prior owners had executed a "declaration of reciprocal easement" allowing use of the alley for access and " 'for necessary ancillary use customary to a service driveway for pick-up, deliver, loading, unloading, trash removal, maintenance and ancillary service activities. . . ." (*Ibid*., italics omitted.)  After unresolved disagreements about Teachers' use of the alley for pick-ups and deliveries in the early morning hours, Furlotti constructed a fence down the center of the alley.  (*Id*. at p. 1491.)

Teachers sued for breach of the easement agreement, nuisance, trespass, and for declaratory and injunctive relief.  (*Teachers*, *supra*, 70 Cal.App.4th at p. 1491.)  Furlotti asserted the easement was "void *ab initio* and use thereunder illegal" because the easement purported to grant Teachers the right to use the portion of the alley zoned for residential purposes for commercial purposes, in violation of the Los Angeles Municipal Code.  (*Id*. at p. 1492.)  The Court of Appeal reversed the trial court's grant of a preliminary injunction in Teacher's favor, concluding Teachers had no reasonable probability of success on the merits.  (*Id*. at pp. 1493, 1498.)

After determining Teacher's use of the alley was commercial in nature and therefore violated the municipal code, the court concluded the easement could not "grant by private agreement that which is prohibited by zoning." (*Teachers*, *supra*, 70 Cal.App.4th at p. 1496.)  The court quoted *City & County of San Francisco v. Safeway Stores, Inc.* (1957) 150 Cal.App.2d 327, 332, in which there were similar circumstances:  " 'There is no question of defendant's ownership of an interest in the . . . easement. . . . The question here is concerning [defendant's] right to use its interest in violation of a zoning ordinance. . . .  [It] had no right to do so.' "  (*Teachers*, at p. 1497, italics omitted.)

16

These cases compel the same conclusion here. While the sewer easement shown on the parcel map may be "valid," Gaffney cannot use it in violation of the California Plumbing Code.

Gaffney claims she might be able to use the parcel map easement in the future because she could apply for, and might be granted, an exception to California Plumbing Code section 721.1. (Cal. Code Regs., tit. 24, §§ 721.1, 721.2) As we have noted, California Plumbing Code section 721.2 provides, "Nothing contained in this code shall be construed to prohibit the use of all or part of an abutting lot to: n(1) Provide access to connect a building sewer to an available public sewer where proper cause and legal easement, not in violation of other requirements, has been first established to the satisfaction of the Authority Having Jurisdiction." (Cal. Code Regs., tit. 24, § 721.1.)

There is no dispute that the "Authority Having Jurisdiction" is the Sanitation District. Gaffney presented no evidence, however, that she sought or obtained the requisite exception from the Sanitation District. Indeed, she admits the " 'authority having jurisdiction' has not yet made this determination." Thus, as the trial court found, "[n]o exception has ever been obtained for this property." Gaffney's speculation that she might be able to establish an exception to California Plumbing Code section 721.1 in the future does not render the court's finding bereft of substantial evidence.

In any case, regardless of whether the requirements for "extinguishment" of the parcel map easement were met,[12] the requirements

---

[12] Drolet maintains for the first time on appeal that the parcel map easement was extinguished under the doctrines of merger, abandonment, or disclaimer, and therefore that portion of the judgment should be upheld. The trial court did not consider these factual claims, and " '[i]t is axiomatic that arguments not raised in the trial court are forfeited on appeal.' " (*Sander v. Superior Court* (2018) 26 Cal.App.5th 651, 670.)

17

for an injunction preventing use of the parcel map easement or any portion of Drolet's property for Gaffney's sewer line were met. (See *Baccouche*, *supra*, 154 Cal.App.4th at pp. 1552, 1558–1559; *Teachers*, *supra*, 70 Cal.App.4th at p. 1497.)

Indeed, Gaffney acknowledges that if she were to "construct a sewer lateral within the Paper Easement without first obtaining approvals" of an exception from the District, "[Drolet] could unquestionably obtain an injunction to enforce the illegal use, as in *Teachers*." She maintains, however, "there is no current controversy which would otherwise allow an injunction to prevent the use of the sewer lateral within the Paper Easement," claiming Drolet was "not suing to stop [her] from installing a lateral within the Paper Easement without first obtaining approvals from the agency having jurisdiction. [Drolet was] suing to *extinguish* the Paper Easement."

Gaffney's claim of "no current controversy" allowing for injunctive relief is disingenuous. Drolet was most certainly suing to stop Gaffney from installing a sewer line anywhere on his property. His cross-complaint sought an injunction "enjoining [Gaffney] . . . from using [Drolet's] Property to connect [Gaffney's] upper lateral sewage line to any public sewage line." And as we have discussed, the trial court did not err in granting such injunctive relief.

## DISPOSITION

The portion of the judgment extinguishing the parcel map easement is reversed. In all other respects, the judgment is affirmed. Costs on appeal to respondents.

_____
Banke, J.

We concur:

_____
Humes, P.J.

_____
Devine, J.*

*Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A163419, Gaffney v. Drolet et al