Filed 4/3/14  Salmon Protection and Watershed Network v. County of Marin CA1/3
(unmodified opinion and first modification attached)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| SALMON PROTECTION AND WATERSHED NETWORK, <br><br> Plaintiff and Appellant, <br> v. <br><br> COUNTY OF MARIN et al., <br><br> Defendants and Respondents. | A137062 <br><br> (Marin County <br> Super. Ct. No. CIV 1004866) <br><br> ORDER FURTHER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 5, 2014, as modified by the order filed herein on March 26, 2014, be further modified in the following respect:

On page 24, in the Disposition, after the words "certification of the related EIR," add the words "with respect to the San Geronimo watershed only" so that the Disposition, which retains the footnote, reads:

> The judgment is reversed. The matter is remanded with instructions to enter a writ of mandate directing the county to set aside its approval of the 2007 CWP and certification of the related EIR with respect to the San Geronimo watershed only, pending preparation of a supplemental EIR with respect to the San Geronimo watershed only that analyzes cumulative impacts in conformity with Guidelines section 15130, subdivision (b) and this opinion, and that describes mitigation measures in conformity with Guidelines section 15126.4 and this opinion or makes other findings in conformity with Guidelines section 15091.

There is no change in the judgment.

Dated: _____        _____ Acting P. J.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SALMON PROTECTION AND WATERSHED NETWORK, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF MARIN et al., <br><br>     Defendants and Respondents. | A137062 <br> (Marin County <br> Super. Ct. No. CIV 1004866) <br><br> ORDER MODIFYING OPINION AND DENYING PUBLICATION AND REHEARING, AND RECOMMENDATION TO SUPREME COURT; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 5, 2014, be modified in the following respect:

On page 24, line 3 of the Disposition, after the words "supplemental EIR," add "with respect to the San Geronimo watershed only" so that the Disposition, which retains the footnote, reads:

> The judgment is reversed. The matter is remanded with instructions to enter a writ of mandate directing the county to set aside its approval of the 2007 CWP and certification of the related EIR, pending preparation of a supplemental EIR with respect to the San Geronimo watershed only that analyzes cumulative impacts in conformity with Guidelines section 15130, subdivision (b) and this opinion, and that describes mitigation measures in conformity with Guidelines section 15126.4 and this opinion or makes other findings in conformity with Guidelines section 15091.

Since this court's opinion does not meet the standard for publication as set forth in rule 8.1105(c) of the California Rules of Court, the requests to partially publish the opinion are denied.  Pursuant to rule 8.1120(b) of the California Rules of Court, the clerk is directed to forward to the Clerk of the Supreme Court the requests for publication, the opinion, and a copy of this order.

The petition for rehearing is denied.  There is no change in the judgment.

Filed 3/5/14  Salmon Protection and Watershed Network  v. County of Marin CA1/3  (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SALMON PROTECTION AND WATERSHED NETWORK,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF MARIN et al.,<br><br>        Defendants and Respondents. | A137062<br><br>(Marin County<br><br>Super. Ct. No. CIV 1004866) |

Salmon Protection and Watershed Network (SPAWN) appeals from the denial of its petition for a writ of mandate challenging the sufficiency of the environmental impact report (EIR) certified by the Marin County Board of Supervisors for the 2007 update of the Marin Countywide General Plan (2007 CWP or the plan). Although the operative petition contains five causes of action attacking on various grounds the sufficiency of the EIR's treatment of the impacts of the plan on coho salmon and steelhead trout, on appeal

1

SPAWN argues only that the EIR fails to properly analyze the plan's cumulative impacts on these threatened salmonids, and that the EIR relies on an inadequate measure to mitigate the impacts of development in the San Geronimo Valley watershed.[1] The trial court denied the petition for a writ of mandate, but in response to a sixth cause of action alleging that the county had failed to adopt a stream conservation area ordinance that the EIR identifies as a mitigation measure, enjoined the county from approving any development applications within stream conservation areas in the San Geronimo Valley watershed until the ordinance is adopted. SPAWN appeals from the denial of the petition and the county cross-appeals from the injunction.

We conclude that the EIR is deficient and that the injunction should not have been entered.

## Background

### 2007 Marin Countywide Plan

Since 1973, Marin County (the county) has adopted four countywide plans. Prior to the 2007 update, the countywide plan was last revised in 1994. The 2007 CWP describes itself as a comprehensive update of the 1994 CWP to address changed conditions since the adoption of the 1994 plan. The 2007 plan envisions that in the unincorporated portion of Marin County, which includes San Geronimo Valley, by 2030 there will be an approximate 20 percent growth in housing units and 40 percent increase in developed nonresidential floor area. Relative to the 1994 CWP, the 2007 CWP

---

[1] Following the county's certification of the EIR, SPAWN and the county agreed to toll the statutory period for filing a judicial challenge to the EIR, to permit settlement discussions. Although not settling the disputes now before us, the negotiations narrowed the issues in contention. This court upheld the validity of the tolling agreement in *Salmon Protection and Watershed Network v. County of Marin* (2012) 205 Cal.App.4th 195. Pursuant to the terms of the tolling agreement, SPAWN's challenge is "limited to the application of the Countywide Plan and [EIR] only to the San Geronimo Watershed." The San Geronimo Valley watershed is a sub-watershed consisting of 9.3 square miles, or 5,952 acres, within the larger Lagunitas Creek watershed in Marin County.

proposes a net decrease of 6,744 acres of residential land use and a decrease in the number of residential units.

Both the 1994 and 2007 plans recognize the importance of local streams and creeks as habitat for coho salmon and steelhead trout. SPAWN's appellate brief quotes from the 1994 CWP: "Riparian systems, streams, and their riparian and woodland habitat are irreplaceable and should be officially recognized and protected as essential environmental resources, because of their values for erosion control, water quality, fish and wildlife, aesthetics, recreation, and the health of human communities." The 2007 CWP articulates goals, policies and implementing programs. Among its stated goals is a "preserved and restored natural environment" in which "Marin watersheds, natural habitats, wildlife corridors, and open space will be protected, restored, and enhanced." The plan recognizes that "[a] number of sensitive natural communities and species are becoming increasingly rare," including coho and steelhead, and that "[n]atural communities, habitats, and corridors essential to wildlife health and movement and plant dispersal are vulnerable." Where inadequate buffers and intensive development threaten streams, "[r]iparian corridors, marshlands, and wetlands can be altered by filling, draining, removal of vegetative cover, and other modifications, eliminating their habitat values and functions." Thus, the plan states, "[t]he continued health and restoration of streams and riparian resources has become an increasingly important policy objective with the designation of the coho salmon and steelhead trout as special-status species by the State and federal governments."

To protect riparian areas, the 1994 CWP established the concept of "Stream Conservation Areas" (SCA), many of which are to be found throughout the San Geronimo Valley watershed, and it adopted numerous polices and implementation measures to protect these areas. An SCA is defined as "the watercourse itself [of perennial, intermittent, and ephemeral streams] between the tops of the banks and a strip of land extending laterally outward from the top of both banks to the widths defined below." The 2007 update revises many provisions relating to the SCA's. While the 1994

3

plan did not always require a 50-foot strip within the setback from the stream, the 2007 CWP requires property owners in the "Inland Rural Corridor," which includes the San Geronimo Valley watershed, to "provide a development setback on each side of the top of bank that is the greater of either (a) 50 feet landward from the outer edge of woody riparian vegetation associated with the stream or (b) 100 feet landward from the top of bank." The 2007 CWP also newly requires a site assessment as part of the permitting process and provides that "[a]n additional setback distance may be required based on the results of a site assessment."

The plan specifies seven permissible uses of property within the area[2] and provides certain exceptions to the necessity of fully complying with SCA criteria and standards. An exception may be allowed if a parcel falls entirely within an SCA or development on the parcel entirely outside the SCA is either infeasible or would have greater impacts on water quality, wildlife habitat, sensitive biological resources, or other environmental constraints than development within the SCA, but in such cases a site assessment by a qualified professional will be required and additional restrictions may be imposed.

To achieve the goals of enhancing native habitat and improving biodiversity, and protecting sensitive biological resources , the 2007 CWP includes numerous policies[3] and implementing programs.[4]

---

[2] These are: " Existing permitted or legal nonconforming structures or improvements, their repair, and their retrofit within the existing footprint; Projects to improve fish and wildlife habitat; Driveway, road and utility crossings, if no other location is feasible; Water-monitoring installations; Passive recreation that does not significantly disturb native species; Necessary water supply and flood control projects that minimize impacts to stream function and to fish and wildlife habitat; Agricultural uses that do not result in any of the following: a. The removal of woody riparian vegetation; b. The installation of fencing with the SCA that prevents wildlife access to the riparian habitat within the SCA; c. Animal confinement within the SCA; and d. A substantial increase in sedimentation."

[3] The policies include, among many others, "Protect[ing] sensitive biological resources . . . through careful environmental review of proposed development applications,

*The Environmental Impact Report*

      The county circulated a draft EIR for the proposed 2007 CWP in January 2007. Following the submission of comments and public hearings the final EIR was circulated in June, 2007. Following the receipt of additional comments, public hearings and certain modifications to the plan and to the EIR, the final EIR was certified in November 2007. According to the EIR, it "is a program EIR under Section 15168 of the *State CEQA Guidelines*. . . . As a program EIR, this document focuses on the overall effect of the [2007 CWP]. This analysis does not examine the effects of site-specific projects that may

including consideration of cumulative impacts, participation in comprehensive habitat management programs with other local and resource agencies, and continued acquisition and management of open space lands that provide for permanent protection of important natural habitats;" "Require[ing] environmental review pursuant to CEQA of development applications to assess the impact of proposed development on native species and habitat diversity, particularly special-status species, sensitive natural communities . . . . Requir[ing] adequate mitigation measures for ensuring the protection of any sensitive resources and achieving 'no net loss' of sensitive habitat acreage, values, and function;" "Restrict[ing] or modify[ing] proposed development in areas that contain essential habitat for special-status species, sensitive natural communities, . . . and riparian habitats . . . ;" "Ensur[ing] that existing stream channels and riparian corridors continue to provide for wildlife movement at roadway crossings . . . while maintaining or restoring natural channel bottom;" "Restor[ing] and stabiliz[ing] stream channels;" and protecting riparian vegetation and restoring damaged portions of SCA's to their natural state.

[4] The programs include, among many others, "Work[ing] with other agencies to develop a program to monitor trends in habitat loss, protection and restoration" and "Establish[ing] cumulative thresholds for habitat loss for particularly vulnerable natural communities" (Program BIO-1.b); "Requir[ing] site assessment by a qualified professional [hired by the county but paid for by the project applicant] for development applications that may adversely affect sensitive biological or wetland resources" (Program BIO-2.a); "Continue to actively participate in the FishNet4C [multi-county]program and work cooperatively with participating agencies to implement recommendations to improve and restore aquatic habitat for listed anadromous fish species and other fishery resources" (Program BIO-2.e); "Adopting a new SCA ordinance that would implement the SCA standards for parcels traversed by or adjacent to a mapped anadromous fish stream and tributary"(Program BIO-4.a); and "When removal of *native* riparian vegetation is unavoidable in an SCA, and mitigation is required, require establishment of native trees, shrubs, and ground covers within a period of five years . . . [at] a minimum replacement or enhancement ratio of 2:1" (Program BIO-4.i).

5

occur within the overall umbrella of this program in the future. The nature of general plans is such that many proposed policies are intended to be general, with details to be worked out during implementation. Thus, many of the impacts and mitigation measures can only be described in general or qualitative terms. The analysis in this program EIR is considered the first tier of environmental review, creating the foundation upon which future, project-specific CEQA documents can build."

The EIR states that land uses and development consistent with the plan "could result in adverse effects to special-status species known from Marin County" and that these effects would be a significant impact. "Conversion of existing natural habitat to urban development, roadways and other infrastructure improvements could result in the elimination of populations of special-status species where present within the limits of proposed grading and development." The report states that adoption and implementation of programs specified in the plan to maintain up-to-date informational resources, require site assessments, and coordinate environmental review with jurisdictional agencies and the project applicant, which should occur within five years, will "substantially reduce adverse effects to special status species." However, to reduce the effects to less-than-significant impacts, the EIR states that continued participation in the FishNet 4C multi-county program will be necessary. Since the 2007 CWP does not call for continued participation in the FishNet 4C program or implementation of the program's recommendations, the EIR includes a mitigation measure, to add to the 2007 CWP a new policy, BIO-2: "Continue to actively participate in the FishNet 4C program and work cooperatively with participating agencies to implement recommendations to improve and restore aquatic habitat for listed anadromous fish species and other fishery resources." The report concludes that adoption of this measure, "together with effective implementation of relevant programs, and oversight by regulatory agencies entrusted with enforcement of State and federal regulations that address protection and management of special-status species, would substantially reduce adverse effects to special-status species resulting from land uses and development consistent with the

6

[CWP update]. Therefore, this would be a less-than-significant project impact and the project's contribution to cumulative impacts would be less than cumulatively considerable."

The EIR also identifies the effects of development and land use activities upon "sensitive natural communities," which includes riparian habitat, as a potential significant impact of build-out consistent with the 2007 CWP. "The significance of a potential impact on a sensitive natural community is dependent on a number of factors, including its rarity, its contribution to other natural habitat values in the vicinity, and the degree to which it is to be modified or eliminated as a result of proposed development. Appropriate compensatory mitigation also depends on feasibility of creating replacement habitat or restoring areas of sensitive natural communities affected by proposed development. These various considerations are not specifically acknowledged in the policies related to sensitive natural communities, but are understood to be part of the site assessment and mitigation programs utilized by qualified professionals and regulatory agencies." The report states that "[u]pdated and expanded policies and programs in the [2007 CWP] would serve to improve and strengthen protections for sensitive natural communities," but that in order to mitigate these impacts to a less-than-significant level, it will be necessary for the county to obtain funding to implement the habitat monitoring program described in the plan as Program BIO-1.b.[5] Funding of that program, "together with effective implementation of relevant programs and oversight by regulatory agencies entrusted with enforcement of State and federal regulations addressing the protection and management of sensitive natural communities, would mitigate potential adverse impacts to sensitive natural communities associated with

---

[5] Mitigation Measure 4.6-2, as included in the EIR, is as follows: "In order to reduce the impact to sensitive natural communities to a less-than-significant level, the County would obtain funding for Program BIO-1.b *(Develop Habitat Monitoring Programs),* revise its priority to medium, and improve the timeframe of its implementation to the medium-term or sooner."

the [2007 CWP] to a less-than-significant level and the project's contribution to cumulative impacts would be less than cumulatively considerable."

The section of the EIR dealing with cumulative impacts essentially repeats the discussion from earlier sections of the report. The introduction to the cumulative impacts section states, "Since cumulative development in the unincorporated area is integrated into the project description itself, the analyses contained in [the discussion summarized above] consider cumulative issues." With respect to impacts on biological resources, the report repeats, "The overall cumulative effect of development would be dependent on the degree to which significant biological and wetland resources are protected or mitigated for as part of individual development projects throughout the county. This includes preservation of areas of sensitive natural communities, protection of essential habitat for special-status plant and animal species, and avoidance of wetlands. Further environmental review of any specific development proposals would further serve to ensure that important biological and wetland resources are identified, protected, and properly managed . . . This environmental review should serve to prevent, minimize, or mitigate most significant adverse development-related impacts. With respect to special-status-species . . . and sensitive natural communities . . ., these would be significant cumulative impacts. With implementation of the policies in the [2007 CWP] and the mitigation measures prescribed for these two impacts, the [2007 CWP] contribution to these impacts would be less than cumulatively considerable."

Among the revisions made to the EIR following circulation of the draft was the inclusion of programs to encourage collaboration with other agencies and interested parties. New Program BIO-4.m is to "[c]ontinue to collaborate with the Marin Resource Conservation District to encourage and support the continued implementation of the Marin Coastal Watersheds Permit Coordination Program, especially the preparation of management and conservation plans where appropriate for agricultural activities within the Stream Conservation Areas." Program BIO-4.t

8

is to "[c]ollaborate with local, regional, state, and federal organizations (Marin Organic, MALT, SPAWN, Marin Audubon, RCD, Fish and Game, RWQCB, Sierra Club, Farm Bureau, Trout Unlimited, and affected property owners) to address long term habitat protection and develop funding mechanisms to address the issue."

Concurrently with certification of the EIR, the Board of Supervisors modified Mitigation Measure 4.6-2 (see fn. 5, *ante*), finding that it was not feasible to assure funding for the habitat funding program and striking from the mitigation measure the requirement to obtain funding. The Board found that the impact on sensitive natural communities therefore would not be mitigated to a less-than-significant level and that "[s]pecial considerations make further mitigation measures or alternatives infeasible."

### *Post-EIR Developments*

As indicated in footnote 1, *ante,* following certification of the EIR, the parties agreed to toll the limitations period for filing an action challenging the sufficiency of the EIR. During the period prior to the filing of this action, several additional steps were taken by the county, in part pursuant to agreements reached with SPAWN, to study and mitigate the effects on salmonids of further development in the San Geronimo Valley Watershed. A moratorium on the issuance of permits for development in SCA's was imposed through February 11, 2010. The county funded and there were prepared by outside contractors first an "Existing Conditions Report" detailing findings of research and monitoring programs in the Lagunitas and San Geronimo watersheds, and then a comprehensive "San Geronimo Valley Salmon Enhancement Plan: A Guidance Document" (SEP), dated February 9, 2010. The SEP, according to its executive summary, "presents science-based recommendations to improve and maintain habitat conditions that will support viable populations of

9

salmon and steelhead trout in San Geronimo Valley."[6] The SEP makes 17 recommendations for enhancing salmon habitat, which apparently are consistent with guidelines released at about the same time by the National Oceanic and Atmospheric Administration. Among the data presented in the SEP is a tabulation of the undeveloped parcels in San Geronimo Valley, the number of allowable units permitted by the 2007 CWP, and projected changes in total impervious areas from allowable buildout in seven planning reaches of the San Geronimo Valley watershed.[7] In October 2008 the county entered a contract for the preparation of an "updated Cumulative Impact Evaluation for the Marin Countywide Plan and EIR"; by subsequent amendments the completion date for this study was extended to January 30, 2014. Since approval of the EIR, the county has also, among other things, modified its native tree ordinance to implement a program included in the 2007 CWP, and has recently adopted a stream conservation ordinance as contemplated in the 2007 CWP which is itself being challenged for alleged failure to comply with CEQA.

*The Litigation*

SPAWN filed the present action challenging the sufficiency of the EIR on September 14, 2010. One year later, on October 21, 2011, SPAWN filed an amended petition adding a cause of action challenging the county's failure to adopt a stream conservation area ordinance within the time frame prescribed as a mitigation measure in the 2007 CWP.

The trial court ultimately upheld the adequacy of the EIR, ruling in part as follows: "As a policy and planning document the CWP, and the [final EIR] which

---

[6] The summary points out, "**This plan is not a regulatory document.** It is not being presented to the County for approval. Any new policies or ordinances informed by the Plan would require a full public process and approval by the Board of Supervisors."

[7] The percent increases in total impervious areas over existing levels range from 1 percent to 16 percent.

10

reviewed it, cannot be expected to provide the detailed, quantitative data on 'the actual amount of habitat that will have to be removed to accommodate future development in the SCAs in San Geronimo, or how that loss of habitat will be offset' as petitioners demand . . ., since the county is unable to predict with certainty, either the form or size the improvements will take, or on which parcels the structures will be built. [¶] At the time of EIR certification, information of how much habitat will be disturbed or must be replaced is too speculative, and the quantitative detail petitioners urge is neither necessary to satisfy the informational content required by CEQA for a program EIR, nor was it reasonably available at the time of preparation of the program EIR. That desired detail must wait for the county's development review of the site-specific applications, at which time, the owner will need to hire a qualified professional to perform 'a detailed parcel-by-parcel assessment [] in order to accurately locate sensitive resources and assess potential impacts resulting from development consistent with the [2007 CWP]. . . .' [¶] The court finds the information in the [final EIR] accurately reflects the severity, scope, and significance of these cumulative impacts of the proposed development on the protected species and sensitive habitats, and contains the requisite specificity upon which the public and policymakers can make informed, environmentally-conscious decisions when later reviewing applications for site-specific projects."

The trial court also denied SPAWN's request to compel the Board of Supervisors to adopt a stream conservation area ordinance, but entered an injunction prohibiting the Board from approving any applications for development within the stream conservation areas in the San Geronimo Valley watershed (with certain limited exceptions) until such an ordinance has been adopted.

As indicated above, SPAWN has timely appealed from the denial of its petition and the county has timely appealed from the injunction.

11

*SPAWN's appeal*

SPAWN makes two principal arguments on appeal. SPAWN contends that the EIR does not comply with the California Environmental Quality Act, Public Resources Code section 21000 et. seq. (CEQA) and the CEQA Guidelines (Cal. Code Regs., tit. 14) (Guidelines) in that it fails to properly analyze the cumulative impacts on threatened salmonids of development in the San Geronimo Valley watershed contemplated by the 2007 CWP, and that the EIR relies on an inadequate mitigation measure to reduce the impacts of development to a less-than-significant level. [8]

1. Cumulative impacts

Spawn argues that "while the EIR recognizes the precarious status of salmonids in the Lagunitas watershed, it does not *analyze or disclose* the cumulative impacts of development permitted by the Plan on riparian habitat or on coho and steelhead populations. Instead of evaluating impacts, through either a quantitative or narrative analysis, the EIR relies on loose, development-friendly policies and future project-specific review." The EIR, SPAWN contends, "does not assess how much habitat will be adversely affected by implementation of the County's development policies, or where those impacts will likely occur. . . . . [G]iven that the EIR defers all analysis and mitigation to future individual site-by-site permitting determinations, under a county policy that allows open-ended 'infeasibility' and other discretionary exemptions to the setback requirements, additional salmonid habitat degradation is virtually certain to occur. That impact, however, is never estimated or evaluated anywhere in the EIR." SPAWN points out that the EIR estimates that approximately 913 new housing units will be built within stream conservation areas throughout the county, but that "the EIR does

---

[8] SPAWN makes a third argument, that the court erred in failing to issue a writ of mandate to compel the county to comply with its mandatory duty to adopt a stream conservation ordinance. The issues raised by this argument are considered in connection with the county's cross-appeal.

not discuss how much of this buildout will occur within the Lagunitas Creek watershed proper or San Geronimo Valley more specifically." "But even more important," the argument continues, "the buildout projections alone provide no clue as to how much salmonid habitat could actually be destroyed or degraded by new impervious surfaces (driveways, roofs, patios, etc.) or the expansion of existing facilities. . . . . the EIR never attempts to identify how much of the San Geronimo Valley's spawning and nursing areas are at risk under the new Plan."Further, SPAWN asserts, the EIR fails to provide a baseline against which to analyze the impact of future development; the EIR contains no analysis or quantification of existing impervious surface area, sediment production, or instream shelter. The supplemental studies prepared or planned to be prepared after certification of the EIR, SPAWN contends, "proposed to do the very analysis that should have been completed in the EIR."

The county argues, correctly, that a program EIR need not contain the degree of specificity required of a project EIR and that the analysis of impacts often may be deferred until the preparation of a tiered impact report when the details of a particular project are known and can be intelligently analyzed. "Where a lead agency is using the tiering process in connection with an EIR for a large-scale planning approval, such as a general plan or component thereof . . . , the development of detailed, site-specific information may not be feasible but can be deferred, in many instances, until such time as the lead agency prepares a future environmental document in connection with a project of more limited geographical scale, as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand." (Guidelines, § 15152, subd. (c); see, e.g., *In re Bay-Delta Programmatic Environmental Impact Report Coordinated Proceedings* (2008) 43 Cal.4th 1143, 1170 (*In re Bay-Delta EIR*); *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 374 (*Rio Vista*).) The county argues that the ultimate impact on salmonids, and on biological resources in general, will depend on the nature of the buildout that subsequently is proposed in the San Geronimo Valley watershed and the extent to which the policies and

13

implementing measures described in the 2007 CWP are incorporated in permits for projects yet to be defined. The County thus defends the sufficiency of the conclusion in the EIR that "[t]he overall cumulative effect of development [on biological resources] would be dependent on the degree to which significant biological and wetland resources are protected or mitigated for as part of individual development projects throughout the county."

The county largely misconstrues SPAWN's contention in arguing against its asserted "position that a detailed watershed analysis, on a parcel by parcel basis, is essential for programmatic review of a general plan." The issue is not whether a "parcel by parcel" analysis is required at this point – SPAWN makes no such contention. Such an analysis obviously is an impossibility at this planning stage. The question is whether the program EIR must contain a more meaningful analysis of the *cumulative* impacts on fishlife of projected development in the watershed. Because the specifics of subsequent construction projects will remain unknown as each project seeks permit approval, the implication of the county's position is that no analysis of the cumulative impacts of development in the watershed will ever be made; the cumulative impact will not be known until the last development has been proposed. The Guidelines point out, however, that one of the advantages of a program EIR is that it "[e]nsure[s] consideration of cumulative impacts that might be slighted in a case-by-case analysis." (Guidelines, § 15168, subd. (b)(2).) "[A] program EIR is designed for analyzing program-wide effects, broad policy alternatives and mitigation measures, cumulative impacts and basic policy considerations, as opposed to specific projects within the program." (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 533-534.) The final clause of section 15152, quoted above, is that the development of site-specific information can be deferred "as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand." (Guidelines, § 15152, subd. (c).) As stated in the comment from the California Regional Water Quality Control Board, which opined that the draft EIR did not sufficiently address

14

cumulative impacts of the plan, "It is the cumulative impacts of the projects that most frequently lead to the decline of a species, not the individual projects."

The EIR here does provide some data concerning the extent of potential development that the 2007 CWP forecasts in the areas critical to the salmonid population. 305 residential units may be located in sites that may adversely affect "special-status plant and animal species," 74 housing units may be located where they may affect "sensitive natural communities," and 913 housing units may be located on parcels "that qualify as a SCA." The EIR breaks these numbers down into the number of units that may be located on parcels that are 0.5 acres or less in size, on which development would likely result in significant adverse impacts because of limited siting flexibility, 0.5 to 2 acres in size, and greater than 2 acres in size, on which there is some siting flexibility to avoid causing adverse impacts. The EIR also discloses the projected square footage of additional nonresidential floor area in these locations, and that only a minimal portion will be on parcels less than 0.5 acres in size. But neither the countywide plan nor the EIR go further to estimate or evaluate in any meaningful terms by how much such construction is likely to affect the streams abutting these sites. While it is undoubtedly true, as the EIR states, that the degree of impact will "depend on the details of specific development plans," the report fails to estimate the maximum potential impact, the range of potential impacts, or the likely net impact if the policies and implementation programs described in the 2007 CWP are applied. What, for example, is the maximum amount of impervious surface that may reasonably be placed in the watershed under the plan? With application of the policies and programs described in the plan, will any salmonid habitat be eliminated and if so, what is a reasonable estimate of the loss, and what variables will determine its extent? While the 2007 CWP provides that noncompliance with SCA standards may be permitted if a parcel falls entirely within an SCA or development on the parcel entirely outside the SCA is either infeasible or would have greater impacts than development within the SCA, how many and what size of lots are estimated to fall within this exception and what is the significance of such exceptions?

15

The cases that have upheld deferred consideration of certain issues when evaluating a general plan do not suggest that such cumulative impacts may be deferred or ignored. For example, in *Rio Vista* the court approved an EIR prepared for adoption of a hazardous waste management plan despite the failure to provide a description of potential future facilities and the deferral of an analysis of the environmental impacts, mitigation measures and alternatives that would relate to the particular facility. (*Rio Vista, supra,* 5 Cal.App.4th at p. 374.) Similarly, in *Bay-Delta* the Supreme Court upheld a program environmental impact statement/environmental impact report for a long-term plan to restore the California Delta although it deferred an analysis of the environmental impacts of supplying water from particular sources that had not yet been determined. (*In re Bay-Delta, supra,* 43 Cal.4th at p. 1170.) In these and other cases (e.g., *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729), the deferred analysis related to the particular impacts that would follow from the selection of a particular project. In such cases, there is an "understanding that additional detail will be forthcoming when specific second-tier projects are under consideration." (*In re Bay-Delta, supra*, 43 Cal.4th at p. 1172.) What is missing in the present case, however, is not an analysis of how salmonids will be affected by the construction of a single building, but a meaningful analysis of the likely cumulative impacts of a widespread buildout, regardless of the details of individual projects. There will be little additional information with which to evaluate cumulative impacts as each successive project is proposed; to the contrary, the ability to evaluate and respond to cumulative impacts will decline with each succeeding project. A more comparable case is *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, which held that an EIR for a 5,000 residential-unit development planned in four phases was deficient for failing to analyze the impacts of supplying water to the project until after adoption of the plan to build the project. The county in that case "could not make an informed decision on whether to adopt the [plan] without being informed, to some reasonable degree, of the environmental consequences of supplying water" to the development. (*Id.* at p. 199.) "No matter what subsequent environmental review might take place, and no matter what additional

16

mitigation measures might be adopted to ameliorate adverse environmental impacts on each of the four 'phases' of planned development," deferring the analysis of the impacts of supplying water until after approval of the development plan "would appear to be putting the cart before the horse." (*Id.* at pp. 199-200.)

In short, while the EIR here confirms that the policies and measures laid out in the 2007 CWP will tend to reduce the adverse ecological impacts of development within the San Geronimo Valley watershed, and that the extent of the impacts will depend on the details of future development plans, the report provides no help to decision-makers or the public to understand the likely consequences, or at least the range of potential consequences, of a buildout within the watershed of the scope described in the countywide plan. Providing that long-term view is the point of a cumulative impact analysis and, as indicated above, the ability to make that analysis is one of the advantages of using a program EIR. Whatever else the county may be doing (or may have done subsequent to the approval of the EIR) to study and respond to these issues, the program EIR that is now before us fails to provide the information—if no more than rationally-based estimates—necessary to make informed judgments about the advisability, so far as the San Geronimo Valley watershed is concerned, of adopting the countywide plan. In approving the EIR despite its failure to provide this critical information, the county prejudicially abused its discretion by failing to proceed in the manner required by CEQA. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435; *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390-1392.)

2. Inadequate mitigation measure

Although not fully described in the EIR itself, the administrative record contains a 2001 report describing the Fishery Network of the Central Coastal California Counties (FishNet 4C) as "a county-based, regional salmonid protection and restoration program, created under a Memorandum of Agreement between the six Central California Coastal

17

Counties of Mendocino, Sonoma, Marin, San Mateo, Santa Cruz and Monterey. A prime objective of the FishNet 4C program has been to evaluate county land management practices and written policies relative to protecting salmonid populations, and to make recommendations for improving those practices and policies." According to a 2004 report prepared for FishNet 4C, the goal of the program is "[t]o facilitate effective local actions that will maintain and improve our region's water quality and riparian habitat, provide increased assistance and education and education for local government and the private sector, and encourage cooperation and coordination between all levels of regulatory responsibility for fishery restoration."

The EIR concludes that "[w]hile adoption and implementation of the . . . policies and programs [described in the 2007 CWP] would substantially reduce adverse effects to special status species in unincorporated Marin County, continued participation in the FishNet 4C program and implementation of four programs in the [2007 CWP] would be required to reduce this impact to a less-than-significant level." Because the draft of the 2007 CWP did not call for continued participation in the FishNet 4C program or implementation of its recommendations, the EIR proposes as Mitigation Measure 4.6-1 the following: "Continue to actively participate in the FishNet 4C program and work cooperatively with participating agencies to implement recommendations to improve and restore aquatic habitat for listed anadromous fish species and other fishery resources." Adoption of this measure (as well as effective implementation of the other programs described in the plan), the EIR states, "would substantially reduce adverse effects to special-status species resulting from land uses and development consistent with the [CWP]." In approving the EIR, the Board of Supervisors adopted Mitigation Measure 4.6-1 and found that in doing so, "[t]he impact is mitigated to a less-than-significant level."

SPAWN contends that Mitigation Measure 4.6-1 is not "the kind of specific, concrete, and enforceable mitigation measure necessary to reach a finding of insignificance." In defending the adequacy of the mitigation measure, the County

18

describes at length reports and recommendations that have previously been issued by or at the behest of the FishNet 4C program, which have led to the adoption of specific salutary measures by the county. These include the county's entry into a multi-agency agreement for the maintenance of unpaved roads in the Lagunitas Creek watershed, to control the runoff of sedimentation into streams, and the adoption of several policies and programs in the 2007 CWP that follow from recommendations of the FishNet 4C program. Yet, as pointed out by the California Regional Water Quality Control Board, which is "extremely supportive" of the FishNet 4C program, it "is a strictly voluntary program and the County is not required to adopt their recommendations." However constructive the coordinated efforts of the FishNet 4C program may have been, and are likely to be in the future, SPAWN is correct that merely committing to "actively participate" in the program and cooperate with other agencies is not a sufficient mitigation measure to justify a finding that the significant impact of buildout on threatened salmonids will be mitigated to a less-than-significant level.

The Guidelines explain that "[m]itigation measures must be fully enforceable through permit conditions, agreements, or other legally-binding instruments." (Guidelines § 15126.4, subd. (a)(2).) "Numerous cases illustrate that reliance on tentative plans for future mitigation after completion of the CEQA process significantly undermines CEQA's goals of full disclosure and informed decisionmaking; and consequently, these mitigation plans have been overturned on judicial review as constituting improper deferral of environmental assessment." (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 92 & cases cited at pp. 92-93; see also *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 670-671.) "An EIR may not defer the formulation of mitigation measures to a future time, but mitigation measures may specify performance standards which would mitigate the project's significant effects and may be accomplished in more than one specified way." (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 280.) "Thus, ' " 'for [the] kinds of impacts for which mitigation is known to be feasible, but where practical

19

considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval.' " ' " (*Id.* at p. 280.)

Mitigation Measure 4.6-1 thus is deficient in multiple respects. It defines no specific measures to be taken to reduce the impact of buildout on the threatened fish species, nor does it specify performance standards by which to evaluate measures that may be recommended by FishNet 4C. Moreover, while the county has committed itself to be cooperative, it has not committed to adopt recommendations made by FishNet 4C, whatever those may be. In *San Joaquin Raptor Rescue Center v. County of Merced, supra,* 149 Cal.App.4th at p. 670, the Court of Appeal held that "[t]he fact that the future management plans would be prepared only after consultation with wildlife agencies does not cure these basic errors under CEQA, since no adequate criteria or standards are set forth." The same is true here: the fact that mitigation measures may be promulgated following consultation with and recommendations by the multi-county program provides no adequate criteria by which to evaluate either the sufficiency of such measures or the extent to which the impacts of future construction in the watershed will be mitigated by those measures. It may be true, as the county argues, that there is "substantial evidence in the record that its participation in the FishNet 4C program reduced impacts to fish." Despite what these efforts may have accomplished to date, the fact remains, as the EIR determined, that future buildout in the watershed continues to pose a significant threat to survival of the salmonids. Mitigation Measure 4.6-1 simply defers the formulation of meaningful mitigation measures to abate this significant impact and fails to comply with the mandates of CEQA.

### *The County's Cross-appeal*

The 2007 CWP states as its Policy BIO-4.1, restricting land use in stream conservation areas by requiring setbacks from the streams and requiring the use of best

management practices. Among the programs designed to implement this policy is BIO-4.a, adoption of a new SCA ordinance.[9] The EIR states that BIO-4.a is among the programs that must be implemented to reduce the impact of development to sensitive natural communities in unincorporated Marin County to a less-than-significant level. Because the measure "would be implemented within five years," the EIR states, it "therefore could be relied upon to reduce this impact." The sixth cause of action added to SPAWN's petition in October 2011alleges that "[t]he County's failure to adopt implementation program BIO-4.a, as required by the County's EIR finding of insignificant impacts and the CWP, constitutes a failure to act in violation of its legal responsibility obligations under CEQA" and seeks a writ of mandate compelling the county to "adopt the implementation program BIO-4.a, the expanded SCA ordinance."

The trial court reasoned that although the county did not dispute its mandatory duty to adopt such an ordinance, "[t]he time frames contained in the CWP are 'targets' or best hope scenarios, and the law should not treat these goals as fixed, mandatory limitation periods within which time the county must act. . . . . [¶] Petitioners are essentially asking the county to move this program to the front of the legislative line, without regard to the other competing and diverse needs of the county's residents. When to prepare and place for consideration the ordinance on the legislative calendar is the consummate discretionary decision. . . . [¶] However, because the CWP mandates and relies upon the enactment of this expanded SCA

_____

[9] BIO-4.a in its entirety reads as follows: "**Adopt Expanded SCA Ordinance**. Adopt a new SCA ordinance that would implement the SCA standards for parcels traversed by or adjacent to a mapped anadromous fish stream and tributary. Such an ordinance could, by way of example, require compliance with the incorporation of best management practices into the proposed project and could consider modest additions to existing buildings that would not result in significant impact to riparian resources, such as additions that do not exceed 500 square feet of total floor area and that do not increase the existing horizontal encroachment into the SCA, provided a site assessment first confirms the absence of adverse impacts to riparian habitats. As part of the new ordinance, consider including additional incentives, such as reduced fees or other similar incentives, to reduce the extent of existing development within an SCA or improve conditions that may be impacting sensitive resources."

21

ordinance to fulfill some of the county's obligations under . . . [CEQA], good cause exists to enjoin the county from approving any development applications for building within the SCAs until the ordinance is adopted." The court therefore denied the petition for a writ of mandate but entered an order enjoining the county "from approving . . . any application for development within the Stream Conservation Area, as defined by the 2007 Countywide Plan Update, in the San Geronimo Valley Watershed [with limited exceptions] . . . until such time as the Streamside Conservation Area Ordinance required by the 2007 Countywide Plan Update is adopted by the Marin County Board of Supervisors. The injunction shall expire by operation of law when the Board of Supervisors adopts the Stream Conservation Area Ordinance." The county appeals from the portion of the judgment granting this injunction while SPAWN argues that the court erred in refusing to grant the writ of mandate.

Initially there is a question of mootness. On October 29, 2013 the county did adopt an ordinance establishing permit procedures for development activities in the SCA. In response to an inquiry from this court asking whether any issues had been mooted, both parties answered in the negative, but for different reasons. The county responded that it remains necessary to determine whether the injunction was properly issued because SPAWN is requesting attorney fees based on having obtained the injunction. SPAWN responded that the issue is not mooted because the ordinance was adopted without completing any environmental review under CEQA and that because another action has been filed challenging the ordinance on this ground, the ordinance is nullified by a "poison pill" provision in the ordinance. This provision reads "that this ordinance shall not be further enforced or applied should litigation against the County of Marin challenging the validity of any part of this ordinance or its environmental review by filed in a court of law." Without passing on the merits of these reasons, we deem it advisable to consider the substantive issues that have been presented.

22

The county continues to acknowledge that it has a duty to enact the implementing ordinance called for in program BIO-4a. "The county has always – and so long as the countywide plan remains as currently written always will – concede that this duty exists." Having made this concession, the county fails to address why, then, the court should not have granted the requested writ of mandate in light of its failure to have complied with that duty. Nor does SPAWN address the reasons for which the trial court denied the writ of mandate.[10] In the absence of responsive briefing, we shall adhere to the trial court's reasoning, that it remains within the discretion of the county to determine when to enact the required ordinance, and therefore that there is no basis to issue a writ of mandate compelling it to do so now. This conclusion is supported by the evidence that was proffered that the county is not ignoring its duty to adopt such an ordinance and has been conscientiously pursuing efforts preparatory to the adoption of the ordinance.

Although there is an undeniable logic to the alternative remedy that the court fashioned to respond to the delay in completing those efforts and adopting the ordinance, there are both procedural and substantive reasons for which the injunction cannot stand. Procedurally, there is no indication that the county received notice that such an order was being considered or given the opportunity to address its appropriateness. Moreover, the order may well affect the rights of those who own property in the San Geronimo Valley watershed who seek construction permits and they too were given no opportunity to address the impact and advisability of such an injunction. Substantively, the necessary predicates for injunctive relief have not been

---

[10] SPAWN does suggest that *Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425 supports its contention that the failure to timely implement a mitigation measure justifies issuance of a writ of mandate. In that case, however, the city was failing to enforce a mitigation measure on which a construction project was conditioned precluding the eviction of tenants and the writ was necessary to preclude mass evictions. As pointed out *post,* no similar showing has been made here that the County is about to authorize construction that would be prohibited by adoption of the promised ordinance.

23

established. The county asserts that "the CWP's self implementing policies and programs function fully and completely as an SCA ordinance would for development applications. The only thing that an SCA ordinance would add in this case is perhaps a more detailed and specific set of procedures (and fees) to follow for relevant development applications within SCA's. But the substantive standards to be applied to those development applications . . . are all within the CWP with sufficient specificity to be applied to all 'development applications' as required by Goal BIO-4, (Riparian Conservation'), of which Implementing Program BIO-4.a, (the ordinance) is part."

Both the 2007 CWP and the predecessor plan that presumably remains in effect pending final approval of the 2007 update require setbacks within the SCA's. The 2007 CWP increases the necessary setback in some instances and also contains additional restrictions on development in the SCA's. As the County points out, design review is required for all proposed development on vacant lots within the SCA's. (Marin County Code, § 22.42.045.)[11] No showing has been made that in the absence of an injunction the County is likely to permit construction within the SCA's without the site-specific environmental review called for in the 2007 CWP, or that it is likely to issue a permit for construction that does not conform to the standards in the 1994 or the 2007 CWP. Indeed, there is no showing that any

---

[11] This code provision reads: "**Design Review for Development Along Anadromous Fish Streams and Tributaries.** In those instances where a vacant legal lot of record in the Countywide Plan's City-Centered, Baylands, or Inland Rural Corridor is proposed for development, any proposed development within the Countywide Plan's Stream Conservation Area that adjoins a mapped anadromous fish stream and tributary shall be subject to Design Review as provided by this chapter if the lot is zoned A, A-2, RA, H1, O-A, RR, RE, R1, R2, C-1, A-P, or VCR, including all combined zoning districts. Development includes all physical improvements, including buildings, structures, parking and loading areas, driveways, retaining walls, fences, and trash enclosures. The determination of the applicability of this requirement shall be based on the streams and tributaries shown on the map entitled 'Marin County Anadromous Fish Streams and Tributaries,' which is maintained and periodically updated by the Community Development Agency."

applications have been or are likely to be submitted for permits authorizing construction that does not conform to the standards prescribed in the 2007 CWP – much less that any such application is likely to be approved. And, given the manner in which the injunction came to be entered, there is no indication that consideration was given to any harm to property owners or others that may be caused by such an injunction. On the record before it, the trial court simply had no authority to add the injunction to its judgment. (E.g., *Teachers Ins. & Annuity Assn. v. Furlotti* (1999) 70 Cal.App.4th 1487, 1493; *Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1041.)

## Disposition

The judgment is reversed. The matter is remanded with instructions to enter a writ of mandate directing the County to set aside its approval of the 2007 CWP and certification of the related EIR, pending preparation of a supplemental EIR that analyzes cumulative impacts in conformity with Guidelines section 15130, subdivision (b) and this opinion, and that describes mitigation measures in conformity with Guidelines section 15126.4 and this opinion or makes other findings in conformity with Guidelines section 15091.[12]

Pollak, Acting P.J.

We concur:

Siggins, J.

Jenkins, J.

---

[12] SPAWN's request that we take judicial notice of the "Recovery Plan for the Evolutionarily Significant Unit of Central California Coast Coho Salmon" is denied.